**KRAFTCO CORPORATION, Plaintiff,**

v.

**BEATRICE FOODS CO., Defendant.**

**Civ. A. No. 485–68.**

United States District Court,
D. New Jersey.

Aug. 3, 1971.

Carpenter, Bennett & Morrissey by Charles B. Collins, Newark, N. J., Anderson, Luedeka, Fitch, Even & Tabin, by Morgan L. Fitch, Jr., Chicago, Ill., for plaintiff.

Hughes, McElroy, Connell, Foley & Geiser by Richard Catenacci, Newark, N. J., Cushman, Darby & Cushman by David E. Varner, Robert B. Murray, Washington, D. C., for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

WORTENDYKE, District Judge:

This case was tried before the Court without a jury and pursuant to Rule 52 F.R.Civ.P.;[1] this Court is undertaking herein to make the required findings of fact and conclusions of law.

It must be noted, however, that this case is by no means an ordinary one. The technology of the art relative to the patent in suit is founded upon organic chemistry. An apt description of the nature and scope of the complexity of the instant case is found in plaintiff's proposed findings of fact in the following language:

"The trial of this suit consumed thirty seven trial days and produced over 4800 pages of record. Beatrice introduced over 1400 exhibits and Kraftco introduced over 375 exhibits. A 63- page joint Stipulation of Facts was filed by both parties on October 2, 1970. [before trial commenced]

In addition to the usual issues of validity and infringement of the patent, this suit involved the questions of (1) the inventorship of the patent, an issue which took up a good share of trial time, (2) the propriety of an Affidavit submitted to the Patent Office by Beatrice during the prosecution of the patent alleging an unexpected result, and (3) a determination of whether a dry whipping composition containing glycerol lacto stearate as the air-incorporating emulsifier is the equivalent of a dry whipping composition containing glycerol lacto monopalmitate as the air incorporating emulsifier."

Senior Circuit Judge Woodbury in Nyyssonen v. Bendix Corporation, 342 F.2d 531 (1st Cir. 1965), cert. den. 382 U.S. 847, 86 S.Ct. 63, 15 L.Ed.2d 86, reh. den. 382 U.S. 934, 86 S.Ct. 310, 15 L.Ed.2d 346, a complex case, considered the provisions of Rule 52 and expressed the Court's views, 342 F.2d at page 532, as follows:

"Counsel are certainly entitled to file proposed findings of fact on their own initiative and we see nothing whatever in any way irregular for a court to ask them to do so, particularly in a highly technical and complicated case like the present. Nor is there any reason why counsel should not cast their requests in a form which if approved could be adopted by the court as its findings. Hazeltine Research, Inc., v. Admiral Corp., 183 F.2d 953 (C.A. 7, 1950), cert. denied, 340 U.S. 896, 71 S.Ct. 239, 95 L.Ed. 650. Ordinarily we think it the better practice for the trial court to prepare its own findings with such help as it may derive from counsels' requests. But this is no ordinary case. In a case of this

---

1. F.R.Civ.P. 52(a):
"In all actions tried upon the facts without a jury * * *, the court shall find the facts specially and state separately its conclusions of law thereon, and judgment shall be entered pursuant to Rule 58; * * *."

difficulty we think the court below was fully justified in avoiding the risk of slipping inadvertently into serious scientific error by relying heavily upon counsel for technical findings based upon highly technical evidence. The question is whether the findings are supported by the evidence. United States v. Crescent Amusement Co., 323 U.S. 173, 184–185, 65 S.Ct. 254, 89 L.Ed. 160 (1944)."

and,

"We can say with the court below that this case presents great difficulties to judges like ourselves who have only the most elementary training in science and mathematics and little experience with modern technological developments."

The undersigned is equally ignorant in the scientific field involved in the patent in suit.

Recognizing its above mentioned limitations the Court directed respective counsel to submit proposed findings of fact with citations to the transcript of the record and to the documentary exhibits and the joint written "Stipulated Facts" on file with the Clerk of this Court. Each of the proposed findings of fact has been checked against the cited record references. Based on considerations of relative credibility of opposing witnesses and the totality of the evidence I find the plaintiff's proposed findings of fact to be in accord with my own views arrived at after my independent review of the record. Accordingly, I have on the authority of *Nyyssonen, supra*, adopted the plaintiff's findings; and my own findings that follow are for the most part verbatim copies of those submitted by plaintiff. I have made some minor additions to and deletions from these drafted findings.

## FINDINGS OF FACT

### GENERAL

1. This is a declaratory judgment action under 28 U.S.C. § 2201 and § 2202 brought by plaintiff, Kraftco Corporation (hereinafter Kraftco), against defendant, Beatrice Foods Co. (hereinafter Beatrice), alleging invalidity, unenforceability and noninfringement of Claims 1 to 24 of United States Patent No. 3,098,748, entitled "Whipping and Powdered Shortening Composition." Beatrice counterclaimed for infringement of the patent. An actual controversy exists between the parties and jurisdiction and venue exist under 28 U.S.C. § 1338(a), and the patent laws of the United States.

2. In August 1968, subsequent to initiation of this action by Kraftco, Beatrice disclaimed Claims 13, 14 and 15 of the patent because of the sale of a composition known as Beatreme A in March of 1958, more than one year prior to the filing date of the patent in suit.

3. At trial, Beatrice stated that it would rely only upon Claim 22 of the patent in suit both with respect to validity and infringement, and agreed that if Claim 22 is held invalid and/or not infringed then all of the remaining claims would be invalid and/or not infringed.

4. The trial of this suit consumed thirty seven trial days and produced over 4800 pages of record. Beatrice introduced over 1400 exhibits and Kraftco introduced over 375 exhibits. A 63-page joint Stipulation of Facts was filed by both parties on October 2, 1970.

5. In addition to the usual issues of validity and infringement of the patent, this suit involved the questions of the inventorship of the patent, an issue which took up a good share of trial time, the propriety of an Affidavit submitted to the Patent Office by Beatrice during the prosecution of the patent alleging an unexpected result, and a determination of whether a dry whipping composition containing glycerol lacto stearate as the air incorporating emulsifier is the equivalent of a dry whipping composition containing glycerol lacto monopalmitate as the air incorporating emulsifier.

## THE DISCLOSURE OF PATENT NO. 3,098,748

6. The patent in suit, also known as the '60 application, was filed March 24, 1960 and is alleged to be a continuation-in-part of abandoned application Serial No. 825,403, filed July 7, 1959, known as the '59 application, and a continuation-in-part application Serial No. 556,062, filed December 29, 1955, known as the '55 application, now Patent No. 3,246,992. The '55 application was sold by Beatrice to General Foods Corporation in connection with the settlement of an Interference with Cameron et al Patent No. 2,913,342 which allegedly covers Dream Whip dry whip topping.

7. The patent in suit discloses and claims whipping compositions in dry powder form, which are also referred to as dry whipping compositions, and powdered shortening; and methods of making the same.

8. The compositions disclosed and claimed in the patent in suit are useful to provide a whipped body as desired in custards, ice creams, puddings, toppings, etc. and instant ice cream bases.

9. Overrun, which is usually expressed as a percentage, is a measure of the gain in volume which occurs when a whippable composition is beaten or whipped. An overrun of 50 percent means that the finished whip contains, by volume, 2 parts liquid and 1 part air; an overrun of 100 percent means that the finished whip contains, by volume, equal parts liquid and air; and an overrun of 300 percent means that the finished whip contains, by volume, 1 part liquid and 3 parts air.

10. A "dry whipping Composition" is a composition which, upon reconstitution with an acqueous medium (milk or water) and whipping, is capable of incorporating air to an overrun of at least 50 percent to provide a stable whipped body.

11. A "dry whip topping" is a dry whipping composition which, when reconstituted with milk or water and whipped, has overrun and stiffness characteristics generally similar to whipped cream.

12. A "powdered shortening" is a dry powdered fat capable of lending "shortness" to baked goods. A powdered shortening may or may not also be a dry whipping composition depending upon whether it will form a stable whipped body when reconstituted and whipped.

13. The patent in suit disclosed dry whipping composition formulations containing 40 to 75 percent by weight fat which may be any bland edible oil with a wide range of melting points from 72° F. to 130° F.; 0 to 10 percent by weight mono- and di-glycerides; 0.5 to 15 percent by weight of a whipping agent selected from glycerol lacto monopalmitate, (GLMP), glycerol lactooleate, (GLO), and propylene glycol monostearate, (PGMS); 5 to 35 percent by weight sweetener; and 1 to 15 percent by weight protein.

14. The whipping agent specified in the patent is more properly termed an air incorporating emulsifier and this terminology is used herein.

15. An air incorporating emulsifier is not included for stiffness of the whipped product, the stiffness being provided by the other ingredients in the formulation.

16. A convenient designation of glycerol lacto monopalmitate is GLMP. GLMP is a group of compounds in a larger family of compounds known as glycerol lactopalmitate which for convenience is designated GLP. GLP is a group of compounds in a still larger family of compounds known as glycerol lacto esters of fatty acids. The disclosure of the patent in suit does not specify GLP or GLS or glycerol lacto esters of fatty acids as air incorporating emulsifiers.

17. A convenient designation of glycerol lactooleate is GLO. GLO is also a group of compounds in the larger family of compounds known as glycerol lacto esters of fatty acids.

18. A convenient designation for propylene glycol monostearate is PGMS. PGMS is one species in a larger family of compounds known as partial esters of a glycol and a higher fatty acid. The disclosure of the patent in suit does not specify partial esters of a glycol and a higher fatty acid as air incorporating emulsifiers.

19. The patent in suit teaches the use of any sweetener or sweetening agent. Corn syrup solids are disclosed as a sweetener in the parent '55 application. The terms sweetener and sweetening agent in the patent in suit include corn syrup solids, and there is no disclosure in the patent of the use of sweeteners or sweetening agents at different levels when substituted one for another based upon the sweetening power of the sweetener.

20. The patent discloses the manufacture of dry whipping compositions by mixing the raw materials with milk or water to form a mixture containing 40 to 60 percent solids; pasteurizing the mixture; homogenizing the pasteurized mixture; and spray drying to provide a powder having a particle size of between 75–200 microns.

21. The patent discloses reconstitution of the whipping composition by mixing with 60% to 85% water or skim milk, or by mixing with 70% to 85% whole milk.

22. Claim 22, the only claim relied on by Beatrice, is dependent upon Claim 1. When Claims 1 and 22 are read together, Claim 22 specifies a dry whipping composition containing 40 to 60 percent edible fat, 0 to 10 percent mono- and di-glycerides, 0.5 to 15 percent glycerol lactomonopalmitate, 5 to 35 percent sweetener, and 1 to 15 percent protein.

23. The patent contains a specific disclosure of a limited group of air incorporating emulsifiers which may be utilized, namely GLMP, GLO and PGMS, and there is no disclosure in the patent of any advantage in the use of one of the named emulsifiers over another in a dry whipping composition.

24. Prior to filing of the application for the patent in suit, Beatrice was not aware of any unexpected result in the use of GLMP in dry whipping compositions as compared to the use of PGMS or GLO in dry whipping compositions.

25. GLMP, GLP, GLO and PGMS were all known food emulsifiers prior to the invention of the patent in suit and there are numerous other food emulsifiers.

26. The patent in suit contains a specific recitation of GLMP, GLO, and PGMS as the air incorporating emulsifier which is contrary to usual and accepted practices in the food technology and food emulsifier arts when it is intended to cover a broader group of compounds as air incorporating emulsifiers.

27. Subsequent to filing of this suit by Kraftco, Beatrice submitted to Kraftco a license agreement the terms of which included any glycerol lacto ester of fatty acids of eight or more carbon atoms as within the scope of the claims of the patent.

28. In 1955 the Durkee Famous Foods Division of the Glidden Company introduced to various cake mix manufacturing companies, including Pillsbury, a shortening which included glycerol lacto esters of fatty acids as an emulsifier, which shortening was later known as Cake Mix 67.

29. Durkee was aware of the superior air-incorporating properties of its Cake Mix 67 shortening, and in its laboratory obtained the lowest specific gravity, i. e., highest air incorporation, it had ever obtained in a cake batter.

30. The research personnel of Pillsbury, upon obtaining a sample of Cake Mix 67, recognized its functionality to provide air incorporation in cake batters prepared from dry cake-mix formulations and also became aware of the excellent air-incorporating properties of Cake Mix 67 shortening in other food systems including whip icings.

31. Sometime in the fall of 1955, Obenauf, Beatrice's Specialty Sales Manager, visited Pillsbury and obtained a

sample of Durkee's Cake Mix 67 shortening. Obenauf learned from Pillsbury that the Durkee Cake Mix 67 shortening had excellent air-incorporating properties in cake batter and Obenauf knew or presumed that Pillsbury contemplated using the Cake Mix 67 shortening in whip icings.

32. Obenauf obtained a sample of Cake Mix 67 shortening from Pillsbury and brought it back to Beatrice's laboratory and gave it to either Noznick or Tatter.

33. In the Beatrice laboratory the sample of Cake Mix 67 shortening obtained from Pillsbury was immediately put into a formulation designed to have whipping characteristics and spray dried, using the ordinary skill of the art.

34. The formulation into which Beatrice placed the Cake Mix 67 shortening sample (which contained in excess of 5 percent glycerol lacto esters of fatty acids) contained 50 percent of the shortening, 30 percent sugar, 10 percent sodium caseinate and 10 percent gum acacia, and was known in the prior art of dry whipping compositions.

35. Pillsbury later contended that it owned the development relating to dry whipping compositions and powdered shortenings containing glycerol lacto esters of fatty acids as the air incorporating emulsifier since Pillsbury had told Beatrice about the air incorporating properties of Cake Mix 67.

36. Beatrice countered Pillsbury's contention by stating to Pillsbury during a joint meeting that Beatrice's invention did not depend at all on the use of Cake Mix 67 shortening obtained from Pillsbury and that the Cake Mix 67 shortening was not an essential ingredient of Beatrice's finished product. Based upon these representations Pillsbury acquiesced in Beatrice's claim of ownership of the development. The discussions in respect of the Cake Mix 67 with Pillsbury were indicated by Obenauf as being in the nature of a "poker game".

37. It was usual practice for Beatrice to evaluate newly available emulsified shortenings in spray dried formulations and to test the resulting powder for whipping characteristics.

38. It was obvious to put a shortening known to contain an air-incorporating emulsifier into a known formulation to produce a dry whipping composition.

39. Beatrice obtained no more than an expected result in substituting a shortening known to have air-incorporating properties in a known whipping composition formulation.

40. Kraftco never used the disclosure of the patent in suit in its development of its dry whipping composition formulations nor did the patent in suit add anything to Kraftco's knowledge of air incorporating emulsifiers or dry whipping compositions.

41. Beatrice did not undertake any extensive experimentation which led to the development of the dry whipping composition specified in Claim 22 of the patent in suit.

42. Beatrice did not prove any discovery of a new mode of operation or function of any of the ingredients of the dry whipping composition specified in Claim 22 of the patent.

43. Beatrice failed to prove commercial success of the dry whipping composition of Claim 22 of the patent.

44. Beatrice was unaware of the relevant market for dry whipping compositions and in 1967 Beatrice's total sales of dry whipping compositions (regardless of whether the compositions were within Claim 22 of the patent) was less than 8 percent of the relevant market as established by Kraftco's market research report.

45. Beatrice did not make any substantial sales of its dry whip topping until after Dream Whip dry whip topping of General Foods Corporation was established in the market.

## THE PRIOR ART

46. Prior art patents and literature disclose dry whipping composition formulations having like ingredients within the ranges of the patent in suit, except for the substitution of the specific air-incorporating emulsifiers GLMP or GLO for other well known air incorporating emulsifiers.

47. The prior art discloses that emulsifiers in the category of glycerol lacto esters of fatty acids, which includes GLMP and GLO, provide improved air incorporation and whipping in various food products including cake batter and ice cream.

48. The validity of the patent in suit depends upon whether the substitution of GLMP, a known air incorporating emulsifier, in a known dry whipping composition formulation is within the skill of the art or is non-obvious.

49. In the food industry at the time of the alleged invention there were two areas of technology, one directed to synthetic whipping compositions and another directed to synthetic food emulsifiers which impart air incorporating properties and improved whipping.

50. The dry whipping composition technology and the food emulsifier technology are both pertinent in considering the skill of the art at the time of the alleged invention.

51. It was within the skill of the art to design dry whipping compositions which provide different degrees of air incorporation to achieve different end uses for products.

52. A naturally occurring whipping cream, on a dry basis, contains about 4.-85 percent protein, 87.7 percent fat, 6.57 percent sweetener, and naturally occurring mono- and di-glycerides and phospholipids which are air incorporating emulsifiers.

53. Pyenson and Tracy disclosed in the Journal of Dairy Science, July 1948, pages 539–55, spray dried whipping cream to which mono- and di-glyceride emulsifiers were added prior to spray drying to supplement the natural phospholipid emulsifiers, thereby providing a dry powdered composition which, upon reconstitution and whipping, formed a stable whipped cream product.

54. Reynolds et al. Patent No. 2,132,436 discloses the use of mono- and di-glycerides in a powdered shortening for providing improved air incorporation in cake batter.

55. Roth et al. Patent No. 2,065,398 discloses the use of mono- and di-glycerides in ice cream as an air incorporating emulsifier to improve overrun.

56. North et al. Patent No. 2,399,565, issued to Beatrice in 1946, discloses the addition of lecithin, a naturally occurring phospholipid emulsifier, to cream followed by spray drying to provide a dry powdered cream product.

57. Proctor and Gamble Company in the 1930's promoted the use of mono- and di-glyceride emulsifiers in shortening to provide improved air incorporation in cake batter and permit the use of larger amounts of water and sugar.

58. Diamond Patents Nos. 2,619,422 and 2,619,423 disclose the use of mono- and di-glyceride air incorporating emulsifiers in dry whipping compositions.

59. The Diamond '422 and '423 patents teach to those skilled in the art that air incorporating emulsifiers, which are functional as batter aerating agents, are also functional in dry whipping compositions and dry whip toppings to provide air incorporation.

60. The Diamond '422 and '423 patents disclose dry powdered dessert mixes and dry whip topping having the same ingredients as the patent in suit except that the Diamond patents disclose mono- and di-glycerides as the air incorporating emulsifier and do not disclose GLMP.

61. The dry whip topping of the Diamond '423 patent includes 35 to 85 percent fat, 0.3 to 20 percent mono- and di-glyceride emulsifier, 5 to 40 percent sweetener, and 1 to 15 percent protein and includes compositions within the scope of Claim 22 except for GLMP.

62. The dry powdered dessert mix of the Diamond '422 patent includes 3 to 85 percent fat, 0.3 to 15 percent mono- and di-glycerides, 15 to 95 percent sweetener, and 1 to 30 percent protein which includes compositions within the scope of Claim 22 except for GLMP.

63. The Diamond '422 and '423 patents disclose a method of making a dry whipping composition which includes each of the steps set forth in Claim 7 except the Diamond '422 and '423 patents do not disclose the specific particle size of 75 to 200 microns recited in Claim 7.

64. Jaeger Patents Nos. 2,508,393 and 2,611,704, not cited in the Patent Office, disclose the use of partial esters of a glycol and a higher fatty acid, e. g., PGMS, as air incorporating emulsifiers in shortening mixes to provide improved batter aeration.

65. Cameron et al. Patent No. 2,-913,342 discloses powdered fat compositions including dry whipping compositions, dry whip topping, powdered shortening, dessert like ice creams and puddings containing each of the ingredients in ranges specified in Claim 22 except the Cameron et al. patent discloses the use of air incorporating emulsifiers which are partial esters of a glycol and a higher fatty acid, e. g., PGMS, instead of GLMP.

66. The Cameron et al. '342 patent discloses that a powdered fat composition may be used as a powdered shortening or a dry whipping composition depending upon the desired end use.

67. The Cameron et al. '342 patent like the Diamond '422 and '423 patents, teaches those skilled in the art that air incorporating emulsifiers that are functional as batter-aerating agents are also functional in dry whipping compositions and dry whip toppings to provide air incorporation.

68. The Cameron et al. '342 patent discloses the process of Claim 7 of the patent in suit except for the specific disclosure of the micron size of the dry powder.

69. The process of Claim 7 was known and used by Beatrice and others more than one year prior to the filing date of the patent in suit and Beatrice failed to establish any criticality in the 75 to 200 micron range specified in Claim 7.

70. The Cameron et al. '342 patent discloses the reconstitution of a dry whipping composition in the same manner as disclosed in the patent in suit.

71. Nature provides a number of naturally occurring air incorporating emulsifiers. Egg yolk and milk provide air incorporating emulsifiers and have long been used to provide air incorporation in cake batter, mayonnaise, whip cream and ice cream.

72. Long prior to the patent in suit, the art was searching for man made emulsifiers to replace or augment naturally occurring emulsifiers and it is known in the prior art that many synthetic emulsifiers are functional to provide air incorporation in cake batters, shortening, pudding, ice cream, and dry whipping compositions.

73. In food technology it is the functionality of an emulsifier in a given system that is important, not the classical textbook categorization of the chemical and physical nature of the emulsifier.

74. It was and is common practice in food technology to evaluate new emulsifiers in various food emulsion systems in which air incorporation is desired, including cake batters, ice cream, and dry whipping compositions.

75. The physical phenomenon of air incorporation is the same in cake batters, ice creams, and dry whipping compositions.

76. Tucker Patent No. 2,329,166 discloses that glycerol lacto esters of fatty acids, including GLP (which includes GLMP) and GLO, are useful emulsifiers.

77. Barsky Patent No. 2,509,414 discloses the use of glycerol lacto esters of fatty acids, including GLS, GLP and GLO, as emulsifiers in shortening to provide air incorporation in cake batter,

and cakes of larger volume and improved texture and grain.

78. Little Patent No. 2,480,332, discloses the use of glycerol lacto esters of fatty acids, including GLS, GLP and GLO, as air incorporating emulsifiers in shortening and in ice cream, and discloses that more air may be incorporated in ice cream and cake batter when glycerol lacto esters of fatty acids are used as the air incorporating emulsifier.

79. Drew Chemical Company, as early as 1947, promoted and sold GLS as an air incorporating emulsifier for use in ice cream.

80. Other prior art patents disclosing that glycerol lacto esters of fatty acids, including GLS, GLP and GLO, are air incorporating emulsifiers include the patents to Iveson et al., No. 2,690,971, Radlove et al., No. 2,957,932, and Chang et al., No. 2,966,410.

81. Radlove et al. Patent No. 2,957,932 discloses mixtures of glycerol lacto esters of fatty acids with mono- and di-glycerides to provide an improved air incorporating emulsifier system.

82. It is obvious and/or within the skill of the art to use glycerol lacto esters of fatty acids, including GLP, GLO, and GLS, as the air incorporating emulsifier in a dry whipping composition.

83. Claim 22 of the patent in suit involves only the substitution of GLMP, a known air incorporating emulsifier, in a known dry whipping composition formulation, and this is obvious and/or within the skill of the art.

84. It is obvious and/or within the skill of the art to prepare dry whipping compositions by a process as disclosed and claimed in the patent in suit.

85. It is obvious and/or within the skill of the art to reconstitute whipping compositions as disclosed and claimed in the patent in suit.

### BEATRICE'S ATTEMPT TO ADD OBENAUF AS AN INVENTOR OF THE PATENT IN SUIT

86. In June 1969, Beatrice made application to this Court to add Obenauf as an inventor of the patent in suit under the provisions of 35 U.S.C. § 256 and submitted an Affidavit executed by Noznick and Tatter, the named inventors of the patent, and by Obenauf, alleging that through error and without any deceptive intention, Obenauf had been inadvertently omitted as an inventor of the patent. Beatrice failed to provide the required oath with its application. The application was denied, without prejudice, in September 1969, and at trial Beatrice reinstated its application to add Obenauf as an inventor.

87. During the course of the trial, Noznick, Tatter and Obenauf executed the required oath which stated that they believed all three are the joint inventors of the patent.

88. Beatrice filed the application to add Obenauf as an inventor to avail itself of the benefit of the earlier filing date of the '59 application after Kraftco filed, in May, 1969, a Motion for Summary Judgment based on prior public use or sale which cited facts occurring in the period between one year prior to the '59 application and one year prior to the '60 application.

89. Beatrice did not prove that it had determined that Obenauf was an inventor prior to the time Kraftco filed its Motion for Summary Judgment and did not make application to change the inventorship until some six years after issuance of the patent and more than one year after suit was filed.

90. Unless Obenauf is added as an inventor, the inventorship of the patent in suit is contrary to the later executed Affidavit and Oath and the testimony of Noznick, Tatter and Obenauf at trial. The Affidavit and Oath have not been disavowed or withdrawn and the patent does not specify the correct inventorship as required by the statute.

91. 35 U.S.C. § 256 requires that there be "proof of the facts" before the Patent Office shall issue a certificate changing the inventorship.

92. When application for changing inventorship is made to a court, rather

than to the Patent Office, the "proof of the facts" required by the court should be no less than that required by the Patent Office. The Patent Office in implementing § 256 of Title 35 adopted Rule 324 requiring there be "satisfactory proof of the facts, or an order of a court before which subject matter is called in question." The "satisfactory proof of facts" required by the Patent Office is set forth in § 201.03 of the Manual of Patent Examining Procedure, which states:

"The required 'statement of the facts verified by all of the original applicants' must include at the least, a recital of the circumstances, including the relevant dates, of (1) the misjoinder and (2) discovery of the misjoinder. Without such a showing of circumstances, no basis exists for a conclusion that the application had been made in name of the original, sole or joint applicant(s) 'by error and without any deceptive intention,' and no foundation is supplied for a ruling that the amendment to remove the names of those not inventors or include those to be added as inventors was 'diligently made.' "

93. The Affidavit submitted by Beatrice does not contain a recital of circumstances and does not comply with Section 201.03 of the Manual of Patent Examining Procedure.

94. Beatrice's application to change the inventorship of the patent was not diligently made.

95. During the trial, much time was devoted to attempting to learn exactly what error, as alleged in the Affidavit, occurred in the omission of Obenauf as an inventor, whether this error was inadvertent, and whether it occurred without any deceptive intention.

96. Beatrice's '55 application, as filed, named Noznick, Tatter, and Obenauf as inventors. The '55 application disclosed and claimed dry whipping compositions containing PGMS but did not disclose the use of GLMP or GLO.

97. In July 1959, Beatrice filed the '59 application as a continuation-in-part application of the '55 application listing Noznick, Tatter, and Obenauf as inventors and disclosing and claiming dry whipping compositions containing GLMP, GLO and PGMS.

98. On November 17, 1959, Cameron et al. Patent No. 2,913,342 issued, and Beatrice undertook a study of its records to determine whether it should copy claims from the Cameron et al. Patent in the '55 application for the purpose of causing an interference in the Patent Office.

99. The '60 application for the patent in suit alleges that it is a continuation-in-part application of both the '55 application and the '59 application, but it only listed Noznick and Tatter as inventors. The '60 application was executed on February 4, 1960, and filed in the Patent Office March 24, 1960. The '60 application is substantially identical, both in disclosure and in its claims with the '59 application, and as filed claimed dry whipping compositions containing GLMP, GLO and PGMS.

100. At a time prior to the filing of the '60 application, which omitted Obenauf as an inventor, Beatrice and Beatrice's counsel undertook a complete review of the inventorship of the subject matter of Beatrice's '55 and '59 applications, and based upon that review, Noznick, Tatter and Obenauf, and also Beatrice's counsel, decided that Obenauf was not an inventor of any of the subject matter disclosed and claimed in either the '55 application or the '59 application.

101. Beatrice took steps to correct the discovered error in inventorship by making an application to the Patent Office to delete Obenauf as an inventor of the '55 application and by filing the '60 application omitting Obenauf as an inventor.

102. The determination to file the '60 application omitting Obenauf as an inventor was made by Noznick, Tatter and Obenauf in consulation with Beatrice's counsel.

103. On three separate occasions in 1960–61, Beatrice's counsel filed communications in the Patent Office during the prosecution of the '59 application stating that Obenauf was not an inventor of dry whipping compositions containing GLMP, GLO or PGMS and would be removed as an inventor on the '59 application.

104. In September 1961, Noznick, Tatter, and Obenauf executed an Affidavit and Oath stating that they had discovered during investigation of records regarding the inventorship of the '59 application and concurrently during investigation of the inventorship of the '55 application and the '60 application, that Obenauf was not an inventor of dry whipping compositions containing GLMP, GLO or PGMS. The affidavit and oath were not filed in the Patent Office and the '59 application was permitted to become abandoned with Noznick, Tatter and Obenauf named as the joint inventors. The affidavit and oath were not disavowed and remain as sworn statements.

105. Since the patent in suit, which names Noznick and Tatter as inventors, and the '59 application, which names Noznick, Tatter and Obenauf as inventors, have different inventive entities, Beatrice cannot have the benefit of the filing date of the '59 application and the effective filing date of the patent in suit is March 24, 1960 and the critical date for determining public use or sale is March 24, 1959.

106. In negotiations with Lever Brothers in 1964, Beatrice's counsel relied upon and took advantage of the earlier determination that Obenauf was not an inventor of the patent in suit by forwarding the very documents now relied upon by Beatrice to show Obenauf is an inventor to counsel for Lever Brothers, stating that the documents supported the conception and reduction to practice of the invention by Noznick and Tatter, and that Obenauf was a corroborating witness, i. e., not an inventor.

107. In discovery depositions in 1968 Noznick, Tatter and Obenauf stated under oath that they believed the unfiled affidavit and oath prepared for filing in the abandoned '59 application were true and accurate, and each testified that Obenauf was not an inventor of the '59 application or an inventor of the '60 application which became the patent in suit.

108. In later discovery depositions in January 1970, subsequent to Beatrice's application to this Court to add Obenauf as an inventor to the patent in suit, Noznick, Tatter and Obenauf were unable to state any circumstances which caused them to believe that the omission of Obenauf as an inventor of the patent in suit arose through "error and without any deceptive intention." They were unable to point out any error in their earlier determination that Obenauf was not an inventor, and stated that they relied upon their counsel's advice, and that counsel told them Obenauf was an inventor.

109. During the discovery deposition in January 1970, Beatrice's counsel instructed Noznick, Tatter and Obenauf not to answer questions on inventorship.

110. At trial, Noznick, Tatter and Obenauf each testified that Obenauf was an inventor but could not point to any facts which would establish the inadvertence and error alleged in the affidavit accompanying the application to add Obenauf as an inventor other than counsel told them Obenauf was an inventor.

111. At trial Tatter testified that the Affidavit and Oath executed in September 1961 to remove Obenauf as an inventor of the '59 application were correct and that he would execute them at the present time. This testimony cannot be reconciled with Beatrice's application at trial to add Obenauf as an inventor to the patent since the subject matter claimed in the '59 application includes the subject matter of Claim 22.

112. At trial Obenauf was unable to recall any facts relating to the error and inadvertence alleged in the unfiled affi-

davit prepared for filing in the '59 application to remove Obenauf as an inventor and stated he relied solely on Counsel's advice.

113. At trial Obenauf twice testified he was not an inventor of the process claims or the use of GLO as an emulsifier, and also testified to the contrary.

114. Beatrice did not prove that Obenauf was a joint inventor of the process claims or in respect of the use of GLO as the air incorporating emulsifier in the claimed dry whipping compositions.

115. In support of the application for the change of inventorship in respect to the patent in suit, Messrs. Varner and Guttag, counsel for Beatrice, filed separate affidavits. These affidavits do not contain a statement of facts setting forth circumstances sufficient to establish that the error in inventorship occurred through inadvertence without any deceptive intention. At trial, counsel for Beatrice did not offer their statement as to circumstances which would establish that the error in inventorship occurred through inadvertence and without deceptive intention.

116. At trial, no new facts were proved which were not previously known to Beatrice and its counsel in respect of the determination of the inventorship of the patent in suit. Any error in inventorship which occurred was an error in judgment of Beatrice and/or its counsel. The application to change inventorship is only based upon a re-evaluation of the same facts known to Beatrice and its counsel prior to the issuance of the patent in suit.

117. Taking the record as a whole, it would appear that the omission of Obenauf as an inventor of the patent in suit not only was not done through error, but was a deliberate and calculated determination made after a complete investigation of the inventorship by Beatrice and by its counsel.

■ 118. There has not been sufficient proof of facts by Beatrice which would establish that error was made in the determination of inventorship by Beatrice, and its counsel, that Obenauf was not an inventor, and there has not been sufficient proof of facts to join Obenauf as an inventor of the patent in suit.

119. The inconsistent sworn statements of Noznick, Tatter and Obenauf during trial, in their discovery depositions, in their oaths and affidavits over a period of ten years, and in their inability to establish facts within their personal knowledge, cause their testimony to be without weight. There is no more reason to believe their present testimony that Obenauf is an inventor than there is to believe their prior testimony given during their discovery depositions and their sworn statements when they executed the affidavits stating Obenauf was not an inventor.

120. The lack of proof of facts and circumstances as to what error occurred in omitting Obenauf as an inventor, and the inconsistent and conflicting testimony of Noznick, Tatter and Obenauf do not provide any reasonable basis for finding that Obenauf was omitted as an inventor of the patent in suit without any deceptive intention; and since the application to add Obenauf as an inventor was made after proof of certain facts as to prior public use or sale by Kraftco which could be overcome by adding Obenauf as an inventor there is cause to believe that such application was made with deceptive intention.

## PROSECUTION OF THE PATENT IN SUIT

121. During the prosecution of the patent in suit before the Patent Office, Cameron et al. Patent No. 2,913,342 was cited as a prior art reference and the Patent Office took the position that the Cameron et al. patent anticipated all of the claims.

122. The patent in suit does not disclose any difference in the performance of PGMS, GLMP or GLO as the air incorporating emulsifier in dry whipping compositions and powdered shortenings.

123. Prior to filing of the '59 application, Beatrice was not aware of any unexpected result in the use of GLMP or GLO as the air incorporating emulsifier in a dry whipping composition as compared to the use of PGMS and Beatrice's counsel was unaware of any unexpected result in 1961.

124. Beatrice found it necessary, in order to obtain the patent in suit, to make a showing to the Patent Office that GLMP and GLO provided an unexpected result when used as the air incorporating emulsifier in dry whipping compositions as compared to the use of PGMS as the air incorporating emulsifier in dry whipping compositions.

125. Beatrice's counsel advised Beatrice that a showing of an unexpected result was required, and Tatter, in association with Beatrice's counsel, Noznick and Obenauf conducted two different series of experiments for the purpose of generating the date required for submission to the Patent Office in the form of an Affidavit.

126. In the experiments for submission to the Patent Office Beatrice made no attempt to compare GLO against PGMS in dry whipping compositions.

127. In the first series of experiments conducted by Tatter, he selected a previously developed dry whipping composition formulation he believed gave a good whip with PGMS and in that formulation he used PGMS from three different sources, each of which he found gave a different whipping result.

128. The purpose of the first series of experiments was to compare the overrun of Beatrice's commercial dry whip topping base formulation containing GLP as the air incorporating emulsifier, and other GLP containing dry whipping compositions within the scope of the claims of the application, with the PGMS containing dry whipping compositions prepared specially for those comparisons.

129. In the first series of experiments conducted by Tatter, the data showed that the PGMS containing dry whipping compositions were all acceptable and were better than or as good as the GLP containing dry whipping compositions.

130. The first series of experiments did not establish any unexpected result in the use of GLMP or GLO as the air incorporating emulsifier in dry whipping compositions as compared to the use of PGMS.

131. Although the data from the first series of experiments was plotted in overrun curves, these curves were withheld from the Patent Office.

132. After studying the results of the first series of experiments, Beatrice devised the second series of experiments for generating data required for submission to the Patent Office.

133. In the second series of experiments Tatter substituted PGMS for GLP on a pound-for-pound basis, and in the data (graphs) submitted to the Patent Office, the PGMS was substituted in a formula devised for GLP.

134. The second series of experiments conducted by Tatter were not valid comparisons in accordance with Tatter's intention because various of the ingredients were not maintained constant. The PGMS used in the first graph submitted to the Patent Office was one shown to have given inferior results in dry whipping compositions in the first series of experiments.

135. Three comparisons from the experiments were selected by Beatrice, and the formulations and graphs plotting overrun versus time for the GLP and PGMS containing compositions were forwarded to Beatrice's counsel.

136. Beatrice's counsel, after discussing the data and graphs with Tatter and Noznick, prepared an Affidavit for submission to the Patent Office containing only two of the three comparisons sent to him by Beatrice and in submitting the Affidavit to the Patent Office, alleged that the graphs attached to the Affidavit illustrated an unexpected result in the use of GLP as compared to PGMS in dry whipping compositions.

137. Beatrice's counsel did not include the third comparison in the Affidavit because in his opinion "the differences (were) not as outstanding".

138. The third comparison, not submitted to the Patent Office, showed that there was no significant difference in the performance of GLP and PGMS in dry whipping composition.

139. Graph 2 of the Affidavit submitted to the Patent Office was inaccurate and showed a greater overrun for the dry whipping composition containing GLP than was actually obtained in the experiment.

140. Beatrice's expert witness testified that differences in overrun of 20 percentage points were not significant, and that 30 to 40 percentage points difference in overrun was only slightly better.

141. The proper way to compare emulsifiers in a dry whipping composition is to develop an optimum dry whipping composition formulation for each emulsifier and make comparisons between optimum formulations because pound for pound substitution of one emulsifier for another in a given formulation may not provide a meaningful comparison.

142. In conducting the experiments for the Affidavit, Beatrice did not attempt to determine optimum dry whipping composition formulations for PGMS and GLMP and make comparisons between the optimum PGMS formulation and the optimum GLMP formulation.

143. Beatrice did not attempt to compare dry whipping compositions containing GLMP with dry whipping compositions prepared in accordance with the examples of Cameron et al. Patent No. 2,913,342.

144. Beatrice did not attempt to compare its dry whipping compositions containing GLMP against General Foods Dream Whip topping, which Beatrice knew contained PGMS and against which Beatrice had continuously compared its dry whipping compositions over a period of some six years. Bea-trice still compares its dry whipping compositions against Dream Whip.

145. Graph 1 of the Affidavit submitted to the Patent Office was not a fair comparison of the performance of PGMS and GLP in dry whipping composition.

146. Graph 2 of the Affidavit submitted to the Patent Office was not a fair comparison of the performance of PGMS and GLP in dry whipping compositions.

147. The affidavit submitted to the Patent Office did not accurately reflect the overall results obtained by Beatrice in comparing GLP and PGMS in dry whipping compositions, and the data obtained by Beatrice in the two series of experiments cannot support an Affidavit that GLP provides an unexpected result in dry whipping compositions as compared to PGMS.

148. At the request of Beatrice's counsel, after filing of this suit, Beatrice's expert witness conducted ex parte tests in which he repeated, to the best of his ability, the experiments in the Affidavit submitted to the Patent Office and did not find the surprising result alleged to the Patent Office by Beatrice. The results of these tests were forwarded to Beatrice's counsel but were destroyed prior to trial.

149. In the ex parte tests conducted by Beatrice's expert, no attempt was made to prepare the best dry whipping composition containing PGMS and Beatrice's expert did only those experiments he was instructed to do by counsel.

150. Beatrice's expert conducted ex parte tests comparing General Foods Dream Whip Topping containing PGMS against a dry whip topping containing GLP and the results showed that Dream Whip was the preferred composition as a retail dry whip topping for home use.

151. Kraftco, after suit was filed, conducted ex parte tests in which the formulations of Examples I and II of the patent in suit were prepared, Example I containing GLP as the air incorporating emulsifier and Example II being

an identical formulation except that PGMS was substituted for GLP. Kraftco's tests showed that the use of GLP in a dry whipping composition as compared to the use of PGMS gave practically identical results.

152. Beatrice's expert also conducted ex parte tests using GLO as the air incorporating emulsifier in a formulation containing carrageenan. Carrageenan is a gum extract from seaweed and is not a specified ingredient of Claim 22. If the carrageenan were omitted from the GLO containing formulation prepared by Beatrice's expert, a satisfactory dry whipping composition would not have been obtained.

153. Beatrice never prepared a dry whipping composition containing GLO as the air incorporating emulsifier which was better than dry whipping compositions containing PGMS.

154. Beatrice failed to disclose to the Patent Office that at the time the Affidavit was filed it had, for a number of years, marketed dry whipping compositions containing PGMS which were acceptable to its customers.

155. Beatrice had a duty to make a full disclosure to the Patent Office of a sufficient number of the experiments it conducted and its prior sales of PGMS containing dry whipping compositions in order that the Patent Office could make an independent determination whether the use of GLP in dry whipping compositions provided an unexpected result as compared to the use of PGMS.

156. Beatrice failed to discharge its duty before the Patent Office. The Affidavit submitted did not fairly represent the data known to Beatrice in order that the Patent Office could make an independent judgment, and the Affidavit, as submitted, was a material misrepresentation of the actual facts known to Beatrice.

157. Beatrice failed to establish that GLO provided an unexpected result in dry whipping compositions as compared to PGMS.

158. The Affidavit submitted to the Patent Office did not comply with the requirements of Section 716 of the Manual of Patent Examining Procedure.

159. The Patent Office relied upon the Affidavit submitted by Beatrice in issuing the patent in suit, and Beatrice relied upon the content of the Affidavit in arguing patentability before the Patent Office.

160. But for the material misrepresentation of Beatrice as to the superiority of GLMP over PGMS in dry whipping compositions the Patent Office would not have issued the patent in suit.

PRIOR PUBLIC USE AND SALE

*a) 1955–1957*

161. Beatrice had a long standing business relation with Pillsbury prior to the fall of 1955 and had sold large quantities of spray dried products to Pillsbury prior to the fall of 1955.

162. In the fall of 1955, Beatrice prepared samples of dry whipping compositions within the scope of the claims of the patent, including Claim 22, identified as Beatreme 919, Beatreme 942, Beatreme 944c, and Beatreme 953a. These samples were submitted to Pillsbury for the purpose of determining Pillsbury's interest in purchasing compositions within the scope of the claims of the patent.

163. The samples submitted to Pillsbury were successful products prepared in Beatrice's laboratory using a specially designed spray dryer which was capable of simulating commercial production conditions and this preparation was in accordance with Beatrice's usual commercial practices.

164. In December 1955 and January 1956, Beatrice manufactured additional quantities of the Beatreme 953 formulation falling within the scope of the claims of the patent in the commercial plant equipment of Wright and Wagner Dairy Company in Beloit, Wisconsin, and submitted samples of these formulations to Pillsbury.

165. When samples were prepared on plant equipment, Beatrice was in a position to sell the product, and Beatrice considered the Beatreme 953 formulation made at Wright and Wagner Dairy in January 1956 to be a commercially acceptable product.

166. In December 1955, Noznick and Dr. North of Beatrice visited Pillsbury, demonstrated formulations within the scope of the claims of the patent to Pillsbury, and while there made a project proposal to Pillsbury.

167. In January 1956, Beatrice submitted to Pillsbury an agreement prepared by Beatrice's counsel under which Beatrice offered to sell to Pillsbury, on an exclusive basis, without the creation of a confidential relationship, whip icing containing Beatreme 953, a dry whipping composition within the scope of the claims of the patent in suit.

168. In March 1956, executives of Pillsbury and Beatrice met and discussed commercial development in the whip topping and whip icing fields.

169. During the meeting Pillsbury contended that the ownership of the development was in Pillsbury since Pillsbury had told Beatrice about the air incorporating properties of Cake Mix 67.

170. Subsequently, Pillsbury lost interest in Beatrice's proposal and there was no actual sale of a product within the scope of the claims of the patent in suit to Pillsbury.

171. In the period October 1956 to February 1957, Beatrice submitted samples of its dry whipping compositions and whip icings made theretofore to Glidden, Stievaters and Pillsbury. The dry whipping compositions were those prepared in January 1956 at the Wright and Wagner Dairy, and are within the scope of the claims of the patent, including Claim 22, and were submitted without any obligation of confidence.

172. Beatrice does not dispute that samples of compositions within the scope of Claim 22 were submitted to Pillsbury more than one year prior to the critical filing date, but alleges that its activities were experimental in nature rather than competitive, thereby falling within the "experimental use" exception to the public use bar.

173. Beatrice's primary purpose in submitting samples to Pillsbury, Glidden and Stievaters was to obtain customer acceptance and sales of a product within the scope of Claim 22.

174. Beatrice has not proved that its motivation in submitting samples to Pillsbury or other customers was primarily for the purpose of continuing Beatrice's research program or for purpose of experiment.

175. Beatrice failed to establish that it ever received any results of testing conducted by Pillsbury or others to which it submitted samples of products within the scope of Claim 22.

176. Beatrice has not proved that any experiments conducted by Pillsbury or others were under Beatrice's control or direction or that any such experiments were intended by Beatrice to be for the purpose of providing data to Beatrice in respect of compositions within the claims of the patent.

177. Beatrice failed to establish its burden of proof that the public use of compositions within the scope of Claim 22 in the period 1955–1957 was experimental.

178. It is immaterial that Pillsbury or other customers did not purchase any product within the scope of Claim 22.

179. Beatreme 953a was priced by Beatrice in November 1956, although it is immaterial whether pricing accompanied the various samples submitted to customers by Beatrice.

*b) 1958–1959*

180. A dry whipping composition within the scope of the claims of the patent in suit, including Claim 22, identified as 1–9–59(d) was prepared on January 8, 1959, and a sample was sent to John Sexto & Co. on January 13, 1959.

181. A dry whipping composition within the scope of the claims of the

patent in suit, including Claim 22, identified as 2–12–1(59), was prepared February 12, 1959, and a sample was sent to Schenlabs Pharmaceutical, Inc. on March 19, 1959.

182. The sending of the 1–9–59(d) and 2–12–1(59) samples to Sexton & Schenlabs was in accord with Beatrice's standard sampling practice and was a competitive use and offer for sale of compositions within the scope of Claim 22 more than one year prior to the filing date of the patent.

183. On January 29, 1959, Beatrice prepared a dry whipping composition in the laboratory known as 1–29–59 whip or alternately as Whip No. 3.

184. On February 16, 1959, processing instructions were transmitted to the Wright and Wagner Dairy for manufacture of Whip No. 3.

185. On March 13, 1959, the Wright and Wagner Dairy received instructions to manufacture 800 pounds of Whip No. 3.

186. Mr. Alton, the manager of the Wright and Wagner Dairy, entered instructions on March 16, 1959 to manufacture 800 pounds of Whip No. 3 on commercial plant equipment.

187. On April 3, 1959, Whip No. 3 was priced by Mr. Alton.

188. A sample of Whip No. 3 was submitted to General Mills on May 19, 1959.

189. On May 27, 1959, 350 pounds of Whip No. 3 was invoiced to General Mills, Inc.

190. On September 2, 1959, 900 pounds of Beatreme Whip No. 3 were invoiced to John Sexton & Co.

191. It was Beatrice's custom to submit samples in order to solicit sales and Beatrice has not denied the sending of the indicated samples. This constituted a competitive use and offer for sale of the subject matter of Claim 22, more than one year prior to filing of the patent in suit.

192. The submission of samples incorporating the subject matter of Claim 22 of the patent to a number of prospective customers prior to and just after the critical date culminating in actual sales shortly after the critical date establishes that Beatrice made a competitive use of the invention of Claim 22 more than one year prior to the filing of the patent in suit.

## THE PATENT IN SUIT IS INVALID FOR BEATRICE'S FAILURE TO DISCLAIM ON CLAIMS 7 AND 16

193. Beatrice disclaimed Claims 13, 14 and 15, directed to a powdered shortening, containing GLMP or GLO subsequent to initiation of this lawsuit because of the sale by Beatrice in March 1958, of a composition known as Beatreme A.

194. Beatreme A was sold as a powdered shortening and it functioned as a batter aerating agent.

195. Beatrice did not disclaim Claim 16, directed to a whipping composition, nor did it charge Kraftco at trial with infringement of Claim 16.

196. There is no significant distinction between Claims 13 and 14, and Claim 16, although Claims 13 and 14 specify powdered shortening and Claim 16 specifies a whipping composition.

197. Formulations within the scope of Claims 13 and 14 are also within the scope of Claim 16.

198. Powdered shortenings are visually indistinguishable from spray dried dry whipping compositions. The compositions specified in Claim 16 may be used as powdered shortenings, and compositions specified in Claims 13 and 14 may be used as dry whipping compositions if they are capable of providing a stable whipped body upon reconstitution and whipping.

199. Beatrice's own evidence showed that the Beatreme A composition sold in March of 1958 was a whipping composition within the scope of Claim 16 and achieved an overrun of 120 percent.

200. Beatreme A compositions sold by Beatrice in 1969 and 1970 were also whipping compositions within the scope

of Claim 16 as evidenced by ex parte tests of Kraftco.

201. Kraftco uses Beatreme A as a dry whipping composition.

202. The steps utilized in the manufacture of Beatreme A in March 1968 included preparing an aqueous mixture of the ingredients having a solids content of 33.5 percent, pasteurizing the mixture, homogenizing the mixture, and spray-drying the mixture to provide a dry powder and are within the scope of Claim 15.

203. Beatrice did not disclaim Claim 7 directed to a method of manufacturing dry whipping compositions, nor did it charge Kraftco at trial with infringement of Claim 7.

204. Claim 7 is within the scope of disclaimed Claim 15 but is more restricted in that Claim 7 recites the solids content of the aqueous mixture and the micron size of the dry powder.

205. It was well known in the prior art prior to 1959 to prepare spray dried products from an aqueous mixture of raw materials having a solids content between 40 and 60 percent and this limitation is insufficient to establish the patentability of Claim 7 over Claim 15.

206. It was well known in the prior art prior to 1959 to prepare spray dried products having a particle size within the range of 75 to 200 microns and this limitation is insufficient to establish the patentability of Claim 7 over Claim 15.

207. Claims 7 and 16 are invalid because of prior public use and sale which was known to Beatrice.

208. Failure to disclaim Claim 7 and 16 causes the patent in suit to be invalid under the doctrine of Maytag Co. v. Hurley Machine Co., 307 U.S. 243, 59 S. Ct. 857, 83 L.Ed. 1264 (1939).

## NO PRESUMPTION OF VALIDITY

209. Beatrice failed to bring to the attention of the Patent Office its prior uses of the subject matter within the scope of the claims of the patent in suit.

210. The Patent Office did not consider the patent to Little, No. 2,480,332, which teaches the utilization of glycerol lacto esters of fatty acids as air incorporating emulsifiers in shortenings, cake batters, and ice cream, or the Ice Cream Hearings which disclosed substantial commercial use of glycerol lacto esters of fatty acids as an air incorporating emulsifier in ice cream products, one of the disclosed uses of the compositions of the patent in suit.

211. Beatrice submitted an Affidavit to the Patent Office upon which the Patent Office relied in granting the patent in suit, which Affidavit was a material misrepresentation of the facts actually known to Beatrice.

212. The patent in suit specifies an inventorship different from the inventorship alleged in an Affidavit and Oath submitted at trial which have not been disavowed.

213. Obenauf is not an inventor of GLO in dry whipping compositions or of the process of the patent in suit.

## NONINFRINGEMENT BY KRAFTCO
### a) Kraftco's Products

214. During trial Kraftco advised Beatrice, on a confidential basis, of five current dry whip topping bases and one complete dry whip topping which Beatrice alleges infringe Claim 22 of the patent. These bases and topping are like the bases and topping formulations disclosed to Beatrice, on a confidential basis, prior to trial.

215. The current dry whip topping bases of Kraftco are identified as Whip Base 50, Whip Base 51, Whip Base 62, Whip Base 63, and Kraft Whip Base, and the complete dry whip topping is identified as Whip Topping No. 150.

216. The Kraftco formulations contain as the air-incorporating emulsifier or whipping agent glycerol lactostearate (GLS) made from high purity stearic acid. This GLS is specially manufactured for Kraftco for its products and is not otherwise commercially available.

217. None of Kraftco's formulations contain between 0.5 and 15 percent GLMP.

218. The GLMP content of Kraftco's formulations is less than 0.5 percent, and Kraftco has an established analytical control procedure to insure that its formulations do not contain GLMP in amounts that would fall within Claim 22 of the patent.

b) *The Patent in Suit Does Not Specify GLS As An Air Incorporating Emulsifier Or Whipping Agent*

219. The patent in suit only discloses GLMP, GLO and PGMS as the air-incorporating emulsifier or whipping agent and Beatrice did not make any broader claim for the air incorporating emulsifier or whipping agent during prosecution in the Patent Office.

220. Beatrice was, prior to filing of the application for the patent in suit, well aware of the practice in the emulsifier art, when more than one fatty acid was contemplated in an air incorporating emulsifier to use terminology which was understood to encompass a group of fatty acids.

221. The terminology glycerol lacto esters of fatty acids will encompass a broad group of air incorporating emulsifiers including GLP, GLMP, GLS, and GLO as well as others.

222. Sometime prior to May 22, 1957 Beatrice learned from Durkee that Cake Mix 67 contained glycerol lacto esters of fatty acids, and prior to filing of the application for the patent in suit Beatrice knew of GLS.

223. Notwithstanding Beatrice's knowledge of broader terminology, Beatrice identified the air incorporating emulsifier throughout the patent in suit as GLMP knowing that in accordance with usual chemical conventions such identification was to a restricted group of compounds.

224. All glycerol lacto esters of fatty acids will not provide satisfactory dry whipping compositions.

225. In specifying both GLMP, a palmitic acid ester, and PGMS, a stearic acid ester, in the patent, Beatrice taught to those skilled in the art that the patent excluded glycerol lacto esters of stearic acid.

226. Beatrice failed to disclose the usefulness of any glycerol lacto esters of fatty acids in the patent other than GLMP and GLO, and Beatrice did not teach those skilled in the art that other glycerol lacto esters of fatty acids were useful and within the claimed subject matter of the patent.

227. A person skilled in the art, upon reading the specification of the patent, would believe that Beatrice intentionally excluded from the patent the use of other glycerol lacto esters than GLMP and GLO, and by not including GLS as an air incorporating emulsifier it intended to exclude GLS.

228. Beatrice is bound by the actions of its counsel in preparing the application for its patent, including the terminology selected by counsel, and cannot argue for a broader interpretation of its patent than the usual interpretation of the patent by those skilled in the art. There is no doubt that counsel which filed and prosecuted the application for the patent in suit on behalf of Beatrice were highly experienced in patent solicitations.

229. Beatrice's claim that the use of GLS as an air incorporating emulsifier in dry whipping compositions infringes Claim 22 is contrary to the teachings to one of ordinary skill in the art.

c) *GLS and GLP Are Not Equivalent*

230. Durkee learned as early as 1955 that GLP and GLS were not equivalent as air incorporating emulsifiers.

231. When Kraftco's Research & Development Division substituted a commercially available GLS on a pound-for-pound basis for GLP in an acceptable dry whip topping base formulation which had previously received management approval, the GLS containing formulation did not provide equivalent re-

sults to those obtained with the GLP containing formulation, and the commercially available GLS containing formulation was not considered to be an acceptable dry whip topping base.

232. When Kraftco's Research & Development Division substituted a specially prepared GLS, manufactured from high purity stearic acid containing less than five percent GLMP, on a pound-for-pound basis, for GLP in a dry whip topping formulation which had previously received management approval, the high purity GLS containing formulation did not provide equivalent results to those obtained with the GLP containing formulation, and the high purity GLS containing formulation was not considered to be an acceptable dry whip topping base.

233. The specially prepared high purity GLS and the commercially available GLS, when substituted in a dry whip topping base formulation developed for GLP by Kraftco's Research & Development Division, did not provide equivalent results, and the high purity GLS containing formulation was inferior to both the commercially available GLS containing formulation and the GLP containing formulation.

234. Kraftco's Research & Development Division thereafter developed a new and different formulation containing specially prepared high purity GLS, which was considered to be an acceptable dry whip topping base.

235. The new formulation developed by Kraftco's Research & Development Division involved more than routine experimentation and was more than a minor change in the formulation. Selection of the ratios of the ingredients of the new formulation was not within the skill of the art at the time.

236. When commercially available GLS was substituted for specially prepared high purity GLS in Kraftco's formulation developed for high purity GLS, the commercially available GLS did not provide equivalent results to the high purity GLS and was not considered to be an acceptable dry whip topping base.

237. The functionality of various glycerol lacto esters of fatty acids as air incorporating emulsifiers in dry whipping compositions is quite unpredictable.

238. The use of specially prepared high purity GLS as the air-incorporating emulsifier in a dry whip topping base is not equivalent in like formulations to the use of GLP or GLMP as the air-incorporating emulsifier.

239. GLS and GLP are complex reaction mixtures containing several chemically different species depending upon the method of preparation and are not homologs since the theory of homology does not apply to complex reaction mixtures.

240. Beatrice's expert witness, although well qualified as an organic chemist, prior to his engagement as an expert witness in this suit, had no practical experience in dry whipping compositions, powdered shortening and their manufacture, and had no experience in food emulsifiers in whipping compositions including ice cream, cake batter and dry whipping compositions or the formulation of food products containing combinations of sweeteners.

241. In an attempt to establish equivalency between GLMP and GLS as air incorporating emulsifiers in dry whipping compositions, Beatrice submitted a series of ex parte tests conducted by its expert witness. Beatrice's expert witness did not exercise any independent judgment in determining formulations or processing conditions for the ex parte tests and did only what he was instructed to do by Beatrice's counsel.

242. The ex parte tests were submitted by Beatrice at trial without prior notice to Kraftco and were for the purpose of establishing equivalency between GLP and GLS as the air-incorporating emulsifier in dry whipping compositions. These tests are entitled to little weight because they were conducted ex parte without prior notice and because they

were conducted only to provide the best results rather than to provide a meaningful experimental study. They are also entitled to little weight in view of the deficiencies of the tests brought out at trial.

243. The ex parte tests of Beatrice did not include proof of the use of GLMP and did not establish equivalency between GLMP and GLS.

244. Although Beatrice's expert testified that GLS was equivalent to GLMP as the air incorporating emulsifier in dry whipping compositions, this opinion was based solely on the ex parte tests he conducted and from reading the literature and is contradicted by the work done by Durkee prior to filing of the application for the patent in suit, the work done by Kraftco in 1965, and the testimony of Kraftco's expert, an experienced worker in the art of dry whipping compositions.

d) *Claim 22 Is Limited To 40 To 60 Percent Fat*

245. Claim 22 specifies about 40 to 60 percent fat whereas the specification indicates that 40 to 75 percent fat may be used.

246. Beatrice intended the particular range specified in Claim 22 and no explanation was given for the narrower range of fat specified in Claim 22.

247. Kraftco's Kraft Whip Base formulations and whip topping formulations contains less than 40 percent fat and this is outside the scope of Claim 22.

e) *Sweetener Level*

248. Claim 22 specifies 5 to 35 percent sweetener. Sweeteners are defined in the patent at Column 2, lines 20–26.

249. Kraftco's dry whip topping base formulations include 28–30 DE corn syrup solids, sucrose and lactose as the sweeteners and a blend of the different sweeteners is necessary for a marketably dry whip topping.

250. In order to bring certain of the Kraftco formulations within the 5 to 35 percent range of sweetener specified in Claim 22, Beatrice urged that the corn syrup solids should be divided into two fractions for purposes of calculation and only that fraction of corn syrup solids which are monosaccharides through hexasaccharides are to be measured in determining the amount of sweetener in the formulations, the remaining fraction being merely a diluent.

251. Using Beatrice's theory of "fractionation" for determining the sweetener content of corn syrup solids, Claim 22 would cover impossible formulations for dry whipping compositions although all of Kraftco's dry whip topping base formulations would fall within the sweetener range specified in Claim 22.

252. The "fractionation" theory urged by Beatrice to measure the amount of sweetener was not shown to be accepted practice in the food industry and was unknown to its expert prior to his engagement in this suit. The "fractionation" theory is contrary to the teachings of the patent in suit and of Patent No. 3,246,992, of which it is alleged to be a continuation-in-part; and is not supported by any documentary evidence.

253. All of the fractions present in corn syrup solids contribute to the overall sweetness of the corn syrup solids, and corn syrup solids are considered to be a sweetener in the food technology art.

254. All of Beatrice's witnesses testified that corn syrup solids of 28–30 DE are considered to be a sweetener in the food industry and were unable to cite any instance at Beatrice or in the industry where the level of corn syrup solids was arrived at by fractionation when corn syrup solids were substituted for other sweeteners.

255. Patent No. 3,246,992, which matured out of the '55 application, states that corn syrup solids are sweeteners to be used in dry whipping compositions without any mention that their sweeten-

er content is to be measured by "fractionation".

256. The patent in suit broadly discloses that any form of sweetener can be used and Beatrice's argument that only certain saccharides are intended as sweeteners is contrary to the plain language of the patent, and the intent of Noznick and Tatter, the named inventors as expressed in discovery depositions in 1968.

257. The prior art and the ordinary skill of the art clearly contemplate the use of corn syrup solids as a sweetener in dry whipping compositions without any "fractionation" of the corn syrup solids to determine the amount of sweetener present.

258. The upper limit of 35 percent sweetener in Claim 22 was intended by Beatrice because Claim 16 specified no sweetener limits. The '55 application specified an upper limit of 60 percent sweetener and the patent discloses a reason for not using more than 35 percent sweetener.

259. Beatrice in its own work substituted corn syrup solids for sucrose (table sugar) on a pound-for-pound basis.

260. The "fractionation" theory propounded by Beatrice is nothing more than a scheme thought up by counsel to bring certain of Kraftco's formulations within the sweetener ranges of Claim 22 which would otherwise be clearly outside the scope of Claim 22.

261. Kraftco's Whip Base 50, Whip Base 51, and Kraftco Whip Base dry whip topping base formulations each contain more than 35 percent sweetener and are outside the sweetener range specified in Claim 22.

262. The sweetener content of Kraftco's dry whip topping base formulations were derived without any purpose of avoiding the patent in suit.

*f) Early Products Containing GLP*

263. In 1964 and 1965 Kraftco produced on commercial scale equipment, but did not sell, 800 pounds of dry whipping compositions containing GLP as the air incorporating emulsifier.

264. The dry whipping compositions containing GLP produced by Kraftco contain more than 35 percent sweetener and are outside the sweetener limit specified in Claim 22.

265. Beatrice offered no proof as to the presence of GLMP (specified in Claim 22) in the dry whipping compositions containing GLP produced by Kraftco.

266. Regardless, the dry whipping compositions, produced but not sold by Kraftco, only comprised two runs of about 400 pounds each which is de minimis.

## CONCLUSIONS OF LAW

1. This Court, having first determined that the patent in suit was anticipated by the prior art and obvious, concludes as a matter of law that the patent in suit is invalid under Sections 101 and 103 of Title 35 U.S.C.[2] Graham v. John Deere Company, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

2. This Court concludes as a matter of law that the patent in suit cannot be accorded a presumption of validity because Beatrice failed to bring to the attention of the Patent Office its own prior public uses of the claimed inven-

---

2. 35 U.S.C. § 101:
"Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title."
35 U.S.C. § 103:
"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102

of this title, if the differences between the subject matter sought to be patented and the prior art are such that *the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art* to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made." [emphasis added]

tion. Marconi Wireless Tel. Co. v. United States, 320 U.S. 1, 63 S.Ct. 1393, 87 L.Ed. 1731 (1943); Strong v. General Electric Co., 305 F.Supp. 1084 (D.Ga. 1969).

3. This Court concludes as a matter of law, based upon its finding that Beatrice's purported sampling of the claimed subject matter of the patent constituted a public use or on sale more than 1 year prior to the date of the patent application, that the patent is invalid. 35 U.S.C. § 102(b);[3] Metallizing Engineering Co. v. Kenyon Bearing and Auto Parts Co., 153 F.2d 516 (2d Cir. 1946), cert. den. 328 U.S. 840, 66 S.Ct. 1016, 90 L.Ed. 1615 (1946); United States Chemical Corporation v. Plastic Glass Corporation, 243 F.2d 892 (3rd Cir. 1957); J. L. Clark Manufacturing Company v. American Can Company, 256 F.Supp. 719 (D.N.J.1966); Philco Corp. v. Admiral Corp., 199 F.Supp. 797 (D.Del.1961).

4. This Court concludes as a matter of law that Obenauf cannot be added as a joint inventor to the patent in suit since the court has been unable to find a lack of deceptive intention or error, 35 U.S.C. § 256; accordingly, the patent in suit cannot be afforded the earlier filing date of the abandoned '59 patent application since the '59 and '60 patent applications do not conform as to inventorship. Merry Manufacturing Company v. Burns Tool Company, 335 F.2d 239 (5th Cir. 1964).

5. This Court concludes as a matter of law that the disclaimer of Claims 7–11 and 16 of the patent in suit was untimely and done to allow the addition of Obenauf as a joint inventor, who had disavowed any part in the invention of these claims. The intent of Beatrice in this regard was deceptive and therefore the untimely disclaimer invalidates the patent in suit. 35 U.S.C. § 253.[4]

6. This Court concludes as a matter of law that Beatrice is not entitled to enjoy the benefits of the "doctrine of equivalents" since the language of the claim is specific and the claims cannot be broadened to include GLS. Therefore, the subject matter of Kraftco's products in issue herein does not infringe the claims of the patent in suit. Parmelee Pharmaceutical Company v. Zink, 285 F.2d 465 (8th Cir. 1961); In re Soll, 97 F.2d 623, 25 CCPA 1309 (1938); In re Wahlforss et al., 117 F.2d 270, 28 CCPA 867 (1941).

7. This Court concludes as a matter of law that this was not an exceptional case justifying an award of reasonable attorney's fees to the plaintiff. 35 U.S.C. § 285.[5]

An Order in conformity with the foregoing Findings of Fact and Conclusions of Law may be presented.

---

3. 35 U.S.C. § 102:
"A person shall be entitled to a patent unless—
(b) the invention was * * * in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States * * *".

4. 35 U.S.C. § 253:
"Whenever, without any deceptive intention, a claim of a patent is invalid the remaining claims shall not thereby be rendered invalid. A patentee, whether of the whole or any sectional interest therein, may, on payment of the fee required by law, make disclaimer of any complete claim, stating therein the extent of his interest in such patent. Such disclaimer shall be in writing, and recorded in the Patent Office; and it shall thereafter be considered as part of the original patent to the extent of the interest possessed by the disclaimant and by those claiming under him.
In like manner any patentee or applicant may disclaim or dedicate to the public the entire term, or any terminal part of the term, of the patent granted or to be granted."

5. 35 U.S.C. § 285:
"The court in exceptional cases may award reasonable attorney fees to the prevailing party."