59 CCPA

John A. WAGONER and Thomas F. Protzman, Appellants,

v.

John W. BARGER and William J. Haggerty, Jr., Appellees.

Patent Appeal No. 8725.

United States Court of Customs and Patent Appeals.

Aug. 24, 1972.

**1378**

Fred S. Lockwood, Chicago, Ill., Greist, Lockwood, Greenawalt & Dewey, Chicago, Ill., attys. of record, for appellants.

William D. Lucas, Francis N. Carten, New York City, Eyre, Mann & Lucas,

New York City, attys. of record, for appellees.

Before RICH, Acting Chief Judge, ALMOND, BALDWIN and LANE, Associate Judges, and CLARK, Justice (Ret.), United States Supreme Court, sitting by designation.

RICH, Acting Chief Judge.

This appeal is from the decision of the Board of Patent Interferences in interference No. 95,734 awarding priority to Barger and Haggerty (hereinafter Barger),[1] senior party by virtue of having been given the benefit of the December 15, 1961, filing date of a parent application.[2] Wagoner and Protzman (hereinafter Wagoner)[3] are concededly entitled to the December 12, 1962, filing date of their parent application,[4] but were held below, in a decision from which they did not appeal, not to be entitled to the April 3, 1961, filing date of their grandparent application.[5] Both parties introduced evidence concerning alleged actual reductions to practice prior to their effective filing dates, and Wagoner additionally challenged Barger's entitlement to their parent's filing date. The board held for Barger on the question of support for the counts in their parent application and against Wagoner on the question of the adequacy of their proof of actual reduction to practice prior to Barger's parent filing date of December 15, 1961, and it accordingly did not find it necessary to consider Barger's proofs of alleged actual reduction to practice prior to the December 12, 1962, filing date accorded Wagoner. Wagoner has appealed from both holdings. We reverse and remand.

*Subject Matter of the Counts*

There are twelve counts, all of which Wagoner copied in modified form from Barger's patent. The first eleven counts define methods of manufacturing films from "amylosic solid materials," and the twelfth defines an article of manufacture made by a process like those recited in the previous counts. The first (paragraphing and emphasis supplied) is illustrative:

1. The method of manufacturing amylosic starch films which comprises

forming a composition comprising amylosic solid materials and an amount of water not in excess of about 50% by weight of said composition,

heating said composition under pressure at a temperature of at least about 250° F. to convert it into a homogeneous plastic mass and

then *extruding* said mass as a self-supporting film *at a temperature not over about 210° F.*

I. *The Issue of Support in Barger's Parent*

Beyond question, Barger's parent application does not contain *express* support for the emphasized recitation. Barger, therefore, relies on the doctrine of inherent disclosure, as set forth, for example, in Binstead v. Littmann, 242 F.2d 766, 769–770, 44 CCPA 839, 844 (1957):

It is true, as was stated in Brand v. Thomas, 96 F.2d 301, 303, 25 C.C.P.A., Patents, 1053, that:

\* \* \* Lack of clear disclosure is not supplied by a speculation as to what one skilled in the art might do or might not do if he followed the teaching of the inventor. The disclosure should be clearer than to suggest that one skilled in the art *might* construct the device in a particular manner. \* \* \* (Italics quoted.)

This is not to say, however, that each limitation in an interference count must be expressly set forth *in*

---

1. Involved on their patent No. 3,243,308, issued March 29, 1966, on application No. 318,159, filed October 23, 1963.

2. Serial No. 159,752.

3. Involved on their application No. 501,861, filed October 22, 1965.

4. Serial No. 244,127.

5. Serial No. 100,554.

haec verba in the disclosure relied upon. It is sufficient if, as in this case, the specification is so worded that the *necessary and only reasonable* construction to be given the disclosure by one skilled in the art is one which will lend *clear support to each positive* limitation in the interference count.

In terms of the statute, 35 U.S.C. § 120, this means that, for an application to be entitled to the benefit of the date of a previously filed, copending application such application must contain a written description of the invention claimed in the second application which complies with the first requirement of the first paragraph of 35 U.S.C. § 112. In re Ahlbrecht, 435 F.2d 908, 910–911, 58 CCPA 848, 852 (1971). However, as we said in In re Lukach, 442 F.2d 967, 969, 58 CCPA 1233, 1235 (1971), "the invention claimed [in the later application] does not have to be described [in the parent] *in ipsis verbis* in order to satisfy the description requirement of § 112." See also Martin v. Johnson, 454 F.2d 746, 750–751, 59 CCPA 769, —— (1972). The question in cases in which the parent application does *not* contain language contained in the claims of the later application is whether the language which *is* contained in the parent application is the legal equivalent of the claim language, in the sense that the "*necessary and only reasonable* construction to be given the disclosure [in the parent application] by one skilled in the art,*"* Binstead v. Littmann, supra, is the same as the construction which such person would give the language in the claims of the later application.

The above question is often a difficult one, the correct resolution of which depends upon complex factual inquiries. Clearly, the burden of proving that language contained in the parent application is the legal equivalent of the language contained in the claims of the later application is on the party asserting the equivalency, regardless of whether he is the junior or senior party

in the interference, Crome v. Morrogh, 239 F.2d 390, 392, 44 CCPA 704, 708 (1956), and the burden is a heavy one. As was remarked in the principal opinion in In re Arkley, 455 F.2d 586, 589, 59 CCPA 804, —— (1972), and not controverted in either of the other opinions, a "line of cases beginning with *Ruschig II* * * * have significantly tightened up on the application of the description requirement in the first paragraph of 35 U.S.C. § 112 * * *." (Footnote, listing three of these cases, omitted.) See also In re Smith, 458 F.2d 1389, 1394, 59 CCPA ——, —— (1972).

Turning to the facts of this case, we note at the outset that both parties have treated the critical language of the counts emphasized above as requiring that the temperature of the *film* at the point of extrusion be "not over about 210° F." The only part of Barger's parent specification in which support for this limitation can arguably be found is as follows:

In the following examples, the extrusion was carried out with a standard screw extruder equipped with a sheeting die. A one inch diameter screw extruder was employed and the particular screw design had a compression gain of 1.5 to 1, and the overall *length of the screw was twenty* inches. The die head was set at openings ranging from 0.001 to 0.004 inch with screw speeds of 40 to 100 rpm. With this equipment, the following temperatures were found to be applicable for satisfactory extrusion:

TABLE II

| | |
|---|---|
| Inlet temperature | 160 to 180° F. |
| Outlet temperature | 350 to 360° F. |
| Die temperature | 190 to 210° F. |

The inlet temperature specified above applied to one-half of the extruder barrel on the feed end, while the outlet temperature applied to the other half of the extruder barrel to which

the sheeting die was attached. A one hundred mesh bronze screen was used between the outlet of the extruder and the die. The gauge pressure at the die head was from 200 to 500 p.s.i.

The film emitted from the die head in our process is highly plastic and contains excess water. This film is then passed directly on to heated rolls where the excess moisture is removed. These rolls are also used to stretch the film to provide an orientation of the film. Depending upon the properties desired, the films may be stretched between about one and five times their original length by suitable adjustment of the roll speeds. The temperature of the heated rolls depends upon film thickness, extrusion rate, and mix composition, and particularly the per cent added water. The temperature of the rolls is adjusted to remove the excess water and normally ranges from about 125 to 200° F.

It will be noted that the temperatures given in Table II refer only to portions of the *extruder* and not to the temperature of the *film* as it is extruded, to which the count refers.

Wagoner's contention that Barger's parent application does not support the counts with respect to this limitation was first ruled on by the primary examiner. He denied Wagoner's motion to deny Barger the benefit of their earlier filing date based on this contention, with the following explanation:

The amylosic film disclosed on page 4 of the earlier filed Barger et al. application is only .001 to .004 thousandths of an inch [sic] in thickness. When such a paper-thin film is extruded through a die having a minimum temperature of 190° F. it would be reasonable to conclude that it would become cooled to a temperature "below about 210° F.".

Wagoner renewed this contention before the board and lost again. The board stated that it "[found] no error in the reasoning set forth by the Primary Examiner in * * * [holding] that the disclosure of the prior application was sufficient to support the counts" and that it "agree[d] with the Examiner in his conclusion that the extrusion of a film of 0.001 to 0.004 inch thickness would have essentially the same temperature as the die through which it was extruded * * *." The board went on to say that it "[found] no convincing evidence of record which would tend to rebut such a conclusion."

We think that the primary examiner erred in focusing on the *lower* limit of the temperature range set forth in Barger's parent and that the board erred in placing the burden of proof concerning this point on Wagoner rather than on Barger. According to our precedents, the burden should have been placed on Barger to prove that one skilled in the art would necessarily obtain extrusion of film "at a temperature not over about 210° F." employing any combination of the variables set forth in Barger's parent—or, in other words, not simply that one skilled in the art *might* come within the scope of the count in following the teachings of the parent application, but that he *necessarily* would. Thus, for Barger to obtain the benefit of the filing date of the parent application, the proof had to show that a person of ordinary skill in the art would *necessarily* obtain extrusion of film "at a temperature not over about 210° F." although he employed a set-up in which (1) a standard screw extruder having the characteristics set forth in the specification was driven at 100 rpm, (2) the sheeting die was set to an opening of 0.004 inches, (3) the outlet temperature of the extruder was 360° F., and (4) the die temperature was maintained at 210° F. (not 190° F.). Obviously, an inquiry into this question would also have to take into consideration the meaning to be given the word "about" in the limitation at bar.

To prove that the description of this aspect of the invention contained in Bar-

ger's parent application inherently supports the limitation of the counts, Barger relies principally upon evidence concerning certain specific experiments allegedly conducted by Barger. Wagoner moved below to strike Barger's testimony for various reasons which need not concern us here, but the board specifically declined to consider that motion, preferring to base its decision on its own, a priori, technical reasoning. Neither party sought reconsideration of the board's decision *not* to decide that issue, and neither party has briefed the issue or in any way sought to obtain from us a ruling on Wagoner's motion. Compare Myers v. Feigelman, 455 F.2d 596, 604, 59 CCPA 834, —— (1972). Nevertheless, Wagoner questions the propriety of the court's consideration of the above-mentioned evidence and other evidence concerning certain ex parte tests conducted by Barger during the course of the litigation.

The procedural history set forth in the previous paragraph might well have left us in a position which we could have resolved only by remanding the case to the board to obtain its ruling on Wagoner's motion to strike or by asking the parties for post-hearing briefs on it so that we could decide the motion ourselves. However, in this case we believe that we need take neither of the above steps because, even if Barger's evidence is properly before us, it is addressed to the wrong issue and is therefore not dispositive of this appeal.

In brief, Barger's evidence concerning the experiments allegedly conducted by Barger is, at best, evidence that it is *possible* to obtain film meeting the controverted count limitation while operating somewhere *within* the ranges set forth in their parent application, because Barger did so. Compare Crome v. Morrogh, supra, 239 F.2d at 392, 44 CCPA at 707–708. Really, it is evidence of actual reduction to practice, not of support for the counts in the parent application, and, while it may be very relevant to the issue on remand from the present appeal, it is not pertinent here.

As for the other evidence upon which Barger relies, in the first place it is only evidence concerning the results of tests made by one party during the interference proceeding without notice to, and in the absence of, the other party, and it is for that reason alone entitled to little or no weight. IV Rivise & Caesar, Interference Law and Practice § 664, "Ex parte Tests During Interference" (1948), and cases cited therein. See also Congoleum Industries, Inc. v. Armstrong Cork Co., 319 F.Supp. 714, 716 (E.D.Pa.1970); and Kraftco Corp. v. Beatrice Foods Co., 342 F.Supp. 1361, 1373 (D.N.J.1971). Moreover, this evidence is subject to much the same objection as applies to the evidence previously discussed.

Wagoner has submitted evidence on this point in the form of expert testimony by the dean of the School of Engineering and Applied Science at Washington University, St. Louis, Missouri. This witness, whose particular field of expertise was directly relevant to this controversy, testified that either complex calculations or difficult measurements were required to ascertain the temperature of materials being extruded through a die slit. While we do not think that the burden was on Wagoner to prove that the temperature of the film in such situations is not necessarily the same as the temperature of the die, this evidence buttresses our suspicion that the board's a priori technical reasoning was in error.

In summary, we conclude that Barger is not entitled to the benefit of the filing date of their parent application and that Wagoner therefore should be regarded as the senior party by virtue of their conceded entitlement to the benefit of *their* parent's filing date.

## II. *The Actual Reduction to Practice Issue*

The Wagoner briefs, as to this issue, argue only that the board erred in not finding that they had actually reduced to practice subject matter falling within counts 1, 2, 5, and 12, and we according-

ly presume that they have abandoned their appeal as to the other counts in this respect.

 Wagoner relies on two runs allegedly conducted some time between March 24 and April 24, 1961, and described in a progress report authored by one Richard E. Ody, a witness. The board held that the Wagoner record concerning these runs was insufficient to establish a successful reduction to practice, and we agree. Basically, the trouble with Wagoner's evidence is that critical portions of it are second hand. Barger's brief has marshalled effectively Mr. Ody's many candid confessions of ignorance or failure of memory, and it would prolong this opinion unduly to set them forth here. Apparently Mr. Ody wrote the report, but much of the information contained therein was supplied to him by an associate who did not testify and whose absence was not explained in any way. Under the circumstances, we agree with Barger that, "even under the most relaxed of modern standards, the testimony of Ody and the hearsay document of Exhibit 12 [Ody's report] fall far short of proving a reduction to practice * * *."

## Summary

For the foregoing reasons, we conclude that the board erred in holding Barger entitled to the benefit of the filing date of their parent application and in awarding priority to Barger in part on the basis thereof, but we agree with the board that Wagoner failed to prove actual reduction to practice of subject matter falling within any of the counts prior to the date of their parent filing date of December 12, 1962. Accordingly, the sufficiency of Barger's proof of actual reduction to practice prior to the filing date of the Wagoner parent application becomes critical, and we *reverse* and *remand* this case to the board for its consideration thereof.

Reversed and remanded.

BALDWIN, J., concurs in the result.