**Godfrey BLOCH, Appellant,**

**v.**

**Benjamin CHIATSE SZE, Appellee.**

**Patent Appeal No. 9163.**

United States Court of Customs and Patent Appeals.

Oct. 4, 1973.

Rehearing Denied Dec. 20, 1973.

---

Ellsworth H. Mosher, Arlington, Va., atty. of record, for appellant.

A. Newton Huff, Wilmington, Del., atty. of record, for appellee. C. Harold Herr, Gerald A. Hapka, Washington, D. C., of counsel.

Before MARKEY, Chief Judge, RICH, BALDWIN, and LANE, Judges, and ALMOND, Senior Judge.

ALMOND, Senior Judge.

This is an appeal from the decision of the Patent Office Board of Patent Interferences awarding priority to appellee, the party Sze. The three counts of the interference correspond to claims in the patent[1] issued to appellant, the party Bloch, that provided the basis for his involvement in this proceeding. Sze provoked the interference by copying these claims into his application.[2]

In an earlier decision involving the same interference, familiarity with which is presumed, this court reversed a decision of the board awarding priority to Bloch on the ground that Sze could not make the counts in issue. See Sze v. Bloch, 458 F.2d 137, 59 CCPA 983 (1972). As a result of that decision, the case was remanded to the board in order for it to consider the question of whether Bloch was entitled to the benefit of the filing date of an application subsequently abandoned but copending with the application which matured into his patent. See fn. 1. On remand the board held that he was not, on the ground that the earlier filed parent application did not comply with the requirements of 35 U.S.C. § 112. We affirm that decision.

## The Subject Matter

In our earlier opinion we described the subject matter of the interference in the following manner:

> The invention in issue relates to a bulked dimensionally stable singles yarn. Singles yarns (i. e., yarns that have not been plied) of continuous synthetic filaments, which have a uniform cross-section, are much denser than yarns of natural staple fibers, which do not have a uniform cross-section. In order to produce a yarn of continuous synthetic filaments which resembles staple fiber yarn, the filaments may be bulked by crimping.

1. U.S. Patent 3,061,998 issued November 6, 1962, on an application filed November 12, 1959, as a continuation-in-part of application serial No. 497,776 filed March 29, 1955.

2. Serial No. 303,214 filed August 14, 1963, as a continuation-in-part of application serial No. 651,018 filed April 5, 1957.

However, strands of crimped filaments are not dimensionally stable since stretching of the strand will straighten out the filaments. To achieve dimensional stability, the crimped filaments may be combined with straight, stress-bearing nonelastic filaments, which limit stretching of the strand. The counts in issue are directed to such a yarn.

Count 1 is illustrative:

1. A bulked dimensionally stable singles yarn composed of a plurality of continuous filaments, certain of said continuous filaments being uniformly crimped throughout at least a portion of their length to provide bulk and others of said continuous filaments being in relatively straight form to provide dimensional stability, said crimped and straight filaments being randomly disposed throughout the cross-section of said yarn.

The Bloch patent, wherein the counts arose, discloses that:

In accordance with one embodiment of the present invention two bundles of continuous filaments composed of the same or of different synthetic materials and derived from separate spinnerettes feeding into the same or into different spinning baths are so processed that the two bundles of filaments have different shrinkage characteristics. These bundles are then combined and subjected to treatment adapted to shrink the various filaments in the bundle.

As a result of this differential shrinkage one group of filaments becomes shorter than the other group thereby causing the longer filaments to pull up and deviate from a straight line condition into gathers, puckers, folds, loops, or other shapes, herein referred to generally as crimps, at various points along their length and thereby form a bulked yarn.

The other counts are somewhat narrower than count 1 and do not present issues requiring a discussion of them and appellant has not asserted that he would be entitled to those counts if he fails to prevail as to count 1.

### Decision Below

The board stated its conclusions regarding the merits of Bloch's parent application in the following way:

In summary we are convinced, considering the specification of Bloch (original description, claims and drawings) as a whole, that it does not provide support for the language of the counts in issue nor does it provide a sufficient written description of the "manner and process of making" the invention of the counts to comply with the requirements of 35 U.S.C. § 112. Accordingly, we hold that Bloch is not entitled to the benefit of the filing date of his parent application for constructive reduction to practice and that he is not entitled to prevail on that basis.

More specifically the board noted that there is no explicit language in Bloch's application literally corresponding to the language in count 1 insofar as it calls for a "bulked dimensionally stable singles yarn"; that the crimped and straight filaments be "randomly disposed throughout the cross-section of said yarn"; and that certain of the continuous filaments be "uniformly" crimped.

However, the board's analysis of the relevant disclosure in Bloch's application *did not end with these observations.* It proceeded to evaluate that which was disclosed in order to determine if there was support, though not ipsissimis verbis, for the counts in issue. As indicated above, it eventually concluded that there was inadequate support for those counts.

### Opinion

We have carefully considered the arguments of the parties as presented in their briefs and at oral argument. However, we have not been persuaded that the board committed reversible er-

ror as it is our opinion that the language of count 1, at least insofar as it calls for "* * * crimped and straight filaments being randomly disposed throughout the cross section of said yarn," does not find adequate support within the meaning of § 112, in the specification to appellant's parent application.

It is clear from the board's opinion, and particularly in view of the summary quoted above, that it was of the view that the specification in question inadequately described the invention of the counts which are directed to yarns and also failed to adequately describe how to make such an invention. With respect to the limitation calling for random disposition of the two filament types, we agree with the latter conclusion but not the former.

Appellant's specification calls for a yarn made up of two different filaments having differential shrinking characteristics and states:

* * * I use * * * two types of strands of filaments, one of which is shrinkable and therefore capable of being contracted when subjected to steaming, dyeing, or other treatment, and one which is relatively stable, the shrinkable strands contracting and

causing the other more stable filaments to distort or crinkle, creating bulkiness in the yarn without fuzziness.

As the board points out, the specification does not specifically state that the filaments of differential shrinkage characteristics are randomly disposed within the yarn before or after the shrinking operation that causes the yarn to bulk. However, it is our view that one skilled in the art would appreciate that this must be accomplished since it would appear to be a necessary condition if the bulking operation referred to in the quoted portion of the specification is to succeed.

In the first place it is clear from appellant's disclosure that bulking occurs because the filament of high shrinkage potential causes the more stable to crinkle as the former contracts. Manifestly this could not occur if the filaments were not intermingled in such a way that the shrinking filaments can act upon the others. We think this requires that the filaments be dispersed in the yarn bundle in such a manner that a filament of one type is proximate to one of the other. This is supported by Figs. 3 and 4 of appellant's specification which are reproduced below:

Fig. 3.

A9262

Fig. 4.

In Fig. 3, the heavy line 3 represents the filament of high shrinkage potential whereas the lighter line 4 represents the stable filament. Fig. 4 represents the yarn bundle of Fig. 3 after shrinking has occurred resulting in a bulked yarn. In these two figures the two different filaments alternate in the yarn in a regular fashion. Arguably such an arrangement is not "random." However, the

disclosure does state that the filaments can "* * * be in any intermingled arrangement." We of course do not read that to include inoperative arrangements.

Furthermore, we think that one skilled in the art would view Figs. 3 and 4 as an idealized representation of the yarn bundle that could not practicably be achieved in actual use since an actual

yarn could be made up of many filaments of each type. More likely the actual pattern would not repeat itself. Thus, in a word, it would be a "random" pattern. Nevertheless, bulking could still occur because the randomness of the dispersed filaments insures that the shrinkage of one set of filaments would crinkle the others.

Although we believe that appellant has an adequate "written description of the invention" insofar as the claims call for a yarn having randomly disposed filaments of the types involved, it is our view that he has not met the additional requirement for a "written description

* * * of the manner and process of making * * * it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make * * * the same * * *." See § 112 and In re Ahlbrecht, 435 F.2d 908, 58 CCPA 848 (1971).

With respect to carrying out the invention insofar as it requires that the filaments be randomly disposed, appellant's specification includes two pictorial representations, Figs. 1 and 2, of apparatus which allegedly accomplish the desired result. These are shown below.

Fig. 1.

A9256

Fig. 2.

These drawings are discussed in the specification as follows:

Referring to the drawings, and more particularly to Figs. 1, 3 and 4, the numerals 1 and 2 designate twin spinnerettes as shown. The strand 3 may be of a larger denier than strand 4. Due to the fact that rollers 7 are drawing faster than rollers 5 feed, it is especially stretched, giving it potential shrinkage. Filaments 4 on the other hand are fed by rollers 6 more nearly equal to the rate of speed at which rollers 7 draw them. Filaments

4 thereby are made more nearly stable with respect to shrinkage.

The special stretching of filaments 3 gives rise to the shrinkage which distorts the more stable filaments 4, creating bulk.

In Fig. 2, a single spinnerette 2' is provided with two groups of extrusion orifices, of which one group may be of different sizes relative to those of the other group, one of these orifice groups may be a center circular one, and one a surrounding annular one,

with two pumps to force the plastic through the orifices to form the strands 3′ and 4′, while the rollers 5′ and 6′ and also the rollers 7′ act as before described.

The size of the filaments is varied by a number of factors such as pressure in the spinnerette, the viscosity of the liquid and the sizes of the orifices, and also the rate of speed at which the filaments are drawn from the orifices.

When carrying out this invention, if it is desired to have a different pressure or different viscosity, twin spinnerettes may be used, or separate feeds within a special dual spinnerette; but when only the sizes of the orifices and/or rate of speed of the rollers drawing off the filaments is to be varied, one spinnerette 2′ may be used with or without the two sets of orifices of different sizes.

In its comments on the specification, the board concluded that processing the filaments according to the steps described above would not result in a comingling of the filaments in a manner that they would be randomly disposed in the resulting yarn bundle shown entering box 8 or 8′, the function of which is not set forth in the specification. We agree with this conclusion and find support for it in the specification to appellant's patent wherein a similar process to the one in the parent application is described. That process requires that the different filament bundles must be "combined" prior to the shrinking operation. Relative to combining the filaments the specification states:

The bundles can be combined by opening the individual bundles as by an air jet or by separating the filaments by suitable guides and combining the bundles with the various filaments interleaved uniformly or with one group predominantly on the outside and the other group predominantly on the inside.

We think that from this the board properly concluded that intermingling of the filament bundles will occur only when the filaments are brought together in an open condition. It would appear from the drawings in the parent application that the individual bundles have already been converged at rollers 5 and 6. Therefore, when the two bundles are converged at rollers 7, the individual filaments are no longer open and hence cannot intermingle.

Appellant argues that the process involved will "inherently" and "inevitably" result in random intermingling. However, as we indicated above, the specification of his patent suggests the contrary. Furthermore, insofar as appellant suggests that the routine manner of yarn handling must cause this result, his assertions are not backed up by reference to any evidence in the record nor has he suggested and backed up with evidence that one skilled in the art would know to augment the disclosed process with procedures well known to the art.

Appellant has extensively relied upon Fig. 2 as showing a workable process. However, in doing so he has argued that there is an obvious error in that figure which would be recognized and corrected by one skilled in the art. Fig. 2 is said to depict a spinnerette 2′ with two sets of orifices arranged in concentric circles. According to appellant, it is obvious that the filaments from the inner circle of orifices cannot practicably be separated from those extruded by the outer orifices and directed to separate sets of rollers. Therefore, he reasons that one skilled in the art would direct both sets of filaments to a single pair of rollers and by so doing intermingling would inherently result because all the filaments are open prior to convergence at the rollers.

This argument, a new one to this case, appears to have been inspired by our earlier decision wherein we agreed with Sze that a cospinning process disclosed by him would result in an intermingling

of filaments. In that process, a single spinnerette with orifices arranged in concentric circles was used.

Although this interpretation flies in the face of what is clearly disclosed in the specification, we do not think it helps appellant if adopted by us. Appellee pointed out at oral argument that his cospinning process produces two different filaments from the concentrically arranged orifices. One of those can be made from two different polymers arranged so that one forms the center of the cylindrical filament and is sheathed by the other. The two polymers are selected so that they have different shrinkage characteristics and will cause this filament to crinkle without stretching. Thus the yarn obtained by his process needs no stretching step.

By contrast, appellant's application does not indicate that spinnerette 2' would be used to produce cospun filaments differing in this way and clearly conveys the notion that stretching is required to achieve potential shrinkage necessary for bulking. Naturally if all the filaments were gathered in a single bundle prior to stretching, no differential shrinkage could be imparted to any two filaments and the bulking operation could not succeed.

Appellant has also argued that certain admissions made by Sze during the course of prosecuting his application and this interference are evidence that "random disposition" would occur in his process. However, these "admissions" were made relative to the Bloch patent, rather than the parent application. That patent's specification is greatly amplified relative to its parent and accordingly we do not feel that Sze was prejudiced by any admissions he may have made.

Appellant bore the burden, a heavy one, of proving that language contained in his parent application is sufficient to support claims in a later filed application. Wagoner v. Barger, 463 F. 2d 1377, 59 CCPA —— (1972). For the foregoing reasons it is our belief that he failed to discharge this burden. The decision of the board is affirmed.

Affirmed.