**Herward A. VOGEL, Appellant,**

v.

**Michael E. B. JONES, Appellee.**

**Patent Appeal Nos. 8868, 8869.**

United States Court of Customs and Patent Appeals.

Oct. 11, 1973.

Stanley G. DeLaHunt, St. Paul, Minn., attorney of record, for appellant; Frank A. Steldt, William G. Ewert, Terryl K. Qualey, Alexander, Sell, Steldt & DeLa-Hunt, St. Paul, Minn., of counsel.

Paul N. Kokulis, Edgar H. Martin, Willliam T. Bullinger, Cushman, Darby & Cushman, Washington, D. C., attorneys of record for appellee.

Before MARKEY, Chief Judge, and RICH, ALMOND, BALDWIN and LANE, Judges.

ALMOND, Senior Judge.

These appeals are from decisions of the Patent Office Board of Patent Interferences awarding priority to appellee (Jones) as to all counts involved in two interferences, Nos. 95,807 and 95,808.[1] We affirm.

Appellant (Vogel) is involved in these interferences through his application serial No. 273,290 filed April 16, 1963. Jones became involved through his application serial No. 320,508 filed October 31, 1963 and claiming priority based on two earlier British provisional applications, No. 41,976 (Brit. 41976) filed November 6, 1962 and No. 10,592 (Brit. 10592) filed March 18, 1963.

---

1. Both interferences were declared February 17, 1967.

*The Subject Matter*

Interference No. 95,807 involves a single count directed to a polymer. It reads as follows:

1. A substantially linear thermoplastic polyarylene polyether composed of recurring units having the formula

Interference No. 95,808 involves the following two counts:

1. A process for the production of polyarylsulfones which comprises heating, in the presence of a catalytic amount of a halide of iron, a mixture of a compound of the formula:

$$R(SO_2X)_y$$

and a compound of the formula:

$$R'(SO_2 X)_w$$

wherein R and R' are respectively y-valent and w-valent aromatic radicals, containing at least two aromatic rings, free from substituent- and hetero-nitrogen atoms, not more than one of the said valence bons being located on any one of said aromatic rings; y is an integer from 1 to 2, w is a digit from zero to 1, and when y is 2, w is zero, and when y is 1, w is 1; and X is a halogen of the group consisting of chlorine and bromine.

2. Thermoplastic, substantially linear polymers consisting essentially of units having the structure:

and units having the structure:

wherein Ar is a divalent radical formed by the removal of one hydrogen atom from each aromatic ring of one of the following:

the ratio of —O— linking groups to —SO₂ —linking groups in said polymer being between 1:9 and 1:1.

Originally interference 95,807 involved a third party who has not appealed the board's decision relative to that interference. Therefore, pursuant to a motion by Vogel, the records in the two interferences were consolidated for purposes of appeal.

*Proceedings Below*

By virtue of his earlier United States filing date, Vogel was made senior party in each interference when it was declared. However, Jones, who claimed the benefit under 35 U.S.C. § 119 of the filing dates of the British applications for priority purposes, moved to shift the burden of proof to Vogel in each case.

These motions were opposed by Vogel on two grounds: one was that the British applications did not support the counts in issue. As an alternative ground, he argued that Jones was not entitled to rely upon these applications for priority purposes regardless of their content. In support of the latter ground, Vogel alleged that Imperial Chemical Industries Ltd. (ICI), the assignee of Jones' United States and British applications involved in this case, also owned a British patent,[2] naming John Dewing as inventor, that had an even earlier filing date than Jones' British applications. According to Vogel, the Dewing patent disclosed the same subject matter as the counts[3] and in such a circumstance Jones should be precluded from obtaining the benefit of the filing dates of the applications relied upon by him for priority purposes.

2. Brit. 927,822 filed May 4, 1960 (S.N. 15,-717), complete specification filed May 4, 1961 and published June 6, 1963.

3. Because of its issue date this patent could not be a reference under 35 U.S.C. § 102 against the Vogel application.

Vogel's position necessarily revolved about the relationship between ICI and Jones vis-a-vis that between ICI and Dewing. In his oppositions to the motions to shift the burden of proof, Vogel argued that Jones must be considered to have had knowledge of the subject matter of the Dewing patent in view of these relationships. Therefore, in his view, Jones cannot be regarded as the first inventor of the subject matter of the counts nor entitled to claim the benefit of the British applications for priority purposes.

The primary examiner concluded that Brit. 41976 did support the counts and granted Jones' motions to shift the burden of proof. He made no comment on Vogel's contention that the identity of ownership as to the Dewing patent and Brit. 41976 precluded Jones from relying upon it for priority.

Having failed in his efforts to oppose, the motions to shift the burden of proof, Vogel took testimony to establish a date of invention earlier than November 6, 1962, the filing date of Brit. 41976. It was in this posture that the two interferences went to final hearing before the board. The board subsequently made the following holdings:

1. Brit. 41976 discloses the subject matter of the counts in issue.

2. It is of no consequence that ICI owned the Dewing patent and Jones' British applications. In its view the controlling point was that Dewing was not Jones rather than the identity of ownership.

3. Vogel did not sustain his burden of proof by showing an actual reduction to practice of the invention before November 6, 1962.

4. Vogel did not prove conception of his invention before November 6, 1962 coupled with diligence to the filing date of his application.

### Issues on Appeal

In his brief before this court, Vogel summarizes that which he regards to be reversible error committed by the board in the following way:

1) In holding that ICI's British provisional 41976 supports the polymer counts viz., the single count of interference '807 and count 2 of interference '808;

2) In holding that Jones is not barred under 35 U.S.C. § 119 from relying on British provisional 41976, even though Jones' assign, ICI, theretofore, on May 4, 1960 filed British provisional 15717, and on May 4, 1961 filed complete application 15717;

3) In holding that Vogel's evidence does not establish conception prior to the November 6, 1962 filing date of said ICI British provisional 41976;

4) In holding that Vogel's evidence does not establish diligence during the period of November 6, 1962 through April 16, 1963, because of "four periods of unexplained inactivity" totaling 23 days; and

5) In awarding priority to Jones.

Vogel also indicates in his brief that he does not contend that Brit. 41976 has inadequate support for the method count (count 1) of interference 95,808 and that he acquiesces in the board's holding that he had not proven an actual reduction to practice prior to November 6, 1962.

### Opinion

#### 35 USC 119 Does Not Bar Reliance By Jones Upon Brit. 41976.

Vogel now contends that on its face 35 U.S.C. § 119 precludes Jones from relying upon Brit. 41976 for priority. In support of this contention, Vogel looks to the language of § 119 which reads, in pertinent part, as follows:

§ *119.* *Benefit of earlier filing date in foreign country; right of priority*

An application for patent for an invention filed in this country by any person who has, or whose legal representatives or assigns have, previously regularly filed an application for a patent for the same invention in a for-

eign country which affords similar privileges in the case of applications filed in the United States or to citizens of the United States, shall have the same effect as the same application would have if filed in this country on the date on which the application for patent for the same invention was *first filed* in such foreign country, if the application in this country is filed within twelve months from the earliest date on which such foreign application was filed * * *. [Emphasis added.]

Vogel's position is that Brit. 41976 is not the "first filed" application referred to in § 119. Instead, if one assumes that the Dewing patent discloses the subject matter of the counts, a point considered irrelevant to its decision by the board, the application underlying that patent was the "first filed." According to him, ICI was, under British practice, not merely Jones' and Dewing's assignee but the actual applicant for patents on their inventions. Therefore, of necessity Brit. 41976 must be considered the second filed application by ICI, Jones' assignee, for the same invention covered by the counts and therefore cannot be relied upon for priority under § 119.

■ For his part, Jones argues that § 119 gives rise to a right of priority that is personal to the United States applicant. Therefore, an application made by an inventor's assignee in a foreign country cannot be the basis for priority unless made on his behalf. Carrying this logic one step further, the existence of an application made by that assignee in a foreign country on behalf of one other than the United States inventor is irrelevant to his right of priority based on applications made on his behalf. We agree.

The predecessor statute (R.S. 4887) to § 119 was enacted on March 3, 1903 (32 Stat. 1225) to implement the Paris Con-

vention[4] to which the United States was an adherent. Unlike § 119, that statute did not expressly provide for a right of priority based on applications filed by "legal representatives or assigns" rather than the inventor himself. Nevertheless, it was early recognized that an application made by another could be the basis for a claim for priority by a United States applicant. See, for example, Steel v. Myers, 205 O.G. 1021, 1914 C.D. 74 and De Jahn v. Gaus, 57 App. D.C. 341, 23 F.2d 762 (1927).

■ This practice arose because it was recognized that in many foreign countries, unlike in the United States, the actual applicant for a patent can be other than the inventor, e. g., an assignee. In light of this, we regard the language in § 119 referring to legal representatives and assigns to merely represent a codification of the actual practice under R.S. 4887. Since under United States law an application for patent must be made by the inventor,[5] that practice was based on the requirement that the foreign application, regardless of the identity of the applicant, must have been filed for an invention actually made by the inventive entity seeking to rely upon it for priority purposes. We think § 119 must be construed to the same end. Therefore, this means that an applicant for a United States patent can rely for priority on the "first filed" application by an assignee on his behalf.

In view of our holding, one caveat is in order. 35 U.S.C. § 115 requires that an applicant for a patent " * * * shall make oath that he believes himself to be the original and first inventor * * * [of the subject matter] for which he solicits a patent * * *. Our holding in this case *presumes* that inasmuch as Jones made such an oath, he believed himself to be the first inventor of the subject matter. Certainly no attack has been made upon the validity of that oath.

4. Convention of Paris for the Protection of Industrial Property 20th March 1883.

5. For pre-1953 law see Kennedy v. Hazelton, 128 U.S. 667, 9 S.Ct. 202, 32 L.Ed. 576 (1888). For the law after January 1, 1953, see 35 U.S.C. § 111 and the limited exceptions in 35 U.S.C. §§ 117 and 118.

### Brit. 41976 Does Support The Counts.

■ As pointed out above, Vogel has conceded that Brit. 41976 adequately supports the method count (count 1) of interference 95,808. However, he makes no similar concession with regard to the two remaining counts, both of which are directed to polymers.

Of these two counts, the count of interference 95,807 is the narrower one. The structure of the polymer of that count might be better appreciated by considering the following representation of a polymer substructure, taken from Vogel's brief, made up of two of the recurring units shown in the count:

It can be seen that each aromatic unit,

[6], is linked to its neighbor by

an —O— substituent at one end, called an ether linkage, and an —$SO_2$— substituent at the other, called a sulfone linkage. Furthermore, it can also be seen that each substituent is separated by four carbon atoms of the aromatic unit. This pattern of substitution on an aromatic unit is known in the art as *para* substitution.[7]

According to Vogel, a polymer conforming to the requirements of the count can be derived by polymerizing a mixture of diphenyl ether and *para, para*-diphenyl ether disulfonyl chloride in the presence of a suitable catalyst, usually ferric chloride, according to the following scheme:

The polymer chain can continue to grow in a similar manner, as shown below, wherein the perpendicular broken lines delineate the recurring units of the count:

---

6. In the system used by organic chemists to depict the chemical structure of aromatic compounds, each corner of the hexagon represents a carbon atom unless otherwise indicated. Furthermore, unless another substituent is shown, the presence of hydrogen (H—) as a substituent on a carbon atom is inferred. The straight lines of the hexagon represent chemical bonds between elements. Thus benzene, the simplest aromatic compound, may be represented by the following equivalent chemical formulae:

7. See Footnote 7 on page 1074.

From this scheme it will be seen that the polymer must arise by the formation of a sulfone linkage between an aromatic unit bearing a sulfonyl halide substituent and the *para* position of another aromatic unit. This occurs by the removal of the corresponding hydrogen substituent of the latter.

By contrast, the polymer of the broader count does not require such a pattern of substitution. By analogy with the scheme shown above, that polymer can be derived by polymerizing *para*, *para'*-diphenyl ether disulfonyl chloride with any of the aromatic compounds allowed by the claim without regard to which hydrogen of a given aromatic ring is removed so long as only one from each is removed in the polymerization reaction.

Both counts call for a "substantially linear" polymer. The parties appear to define a linear polymer as one that is not "branched" or "crosslinked." A "branched polymer" is one where one polymer chain has attached itself to another other than at the end of the latter.

For example, according to Vogel, the polymer of the count of interference 95,807 may become branched in the manner shown:

Although the nature of a crosslinked polymer is not clearly shown by the parties, it is apparent from discussions in their briefs that such a polymer arises when the free end of one branch of a branched polymer attaches itself to yet another polymer chain at a site other than its end. Branching and crosslinking reduce or eliminate the desirable thermoplastic properties of the polymer.

With regard to the narrower count of interference 95,807, the board found support in Brit. 41976 for that count wherein a preferred polymer is described as "having repeating units of the structure

where P and P$^1$ are each oxygen atoms * * *."

It will be seen that this substructure has the necessary *para* substitution pattern. The board's opinion also alludes to statements in the specification to the effect that the polymers are thermoplastic and it points to examples wherein polymerization reactions are described using the same monomers and catalyst that Vogel has alleged to be precursors to the desired polymer.

Vogel relies heavily upon the language of the count, wherein it requires that the polymer be "substantially linear" and "composed of" the recited recurring unit, for the proposition that Brit. 41976 does not possess adequate support. In his view, the portion of that application relied upon by the board describing the polymer as "having" the recurring unit depicted above is broader than the "composed of" language of the count as it does not preclude other repeating units from being present in the polymer and

7. By contrast, an aromatic unit having two substituents separated by 3 carbon atoms is *meta* substituted. An aromatic unit bearing substituents on adjacent carbon atoms is *ortho* substituted.

does not limit the polymer to one that is substantially linear.

In particular, Vogel argues that the process used in the examples relied upon by the board in conjunction with the description of the preferred polymer does not rule out the possibility that the polymerization reaction occurred to give repeating units having *ortho* and *meta* rather than, or as well as, *para* substitution. In his reply brief, he explains this possibility in the following way:

> But note from the following depiction of the two materials that *five hydrogen atoms are available* on each ring (for simplicity shown on one ring) of the second compound with which the chlorine *may* react to initiate polymerization—

> Only if the chlorine of the first compound reacts with, and *only with*, the hydrogen located in the para position of the second compound (denoted by the dotted rectangular box), can the repeating unit of the polymer count result * * *.
>
> Note, however, that *four other hydrogens* on each ring of the second compound are available for reaction, two in the meta position (dotted circles) and two in the ortho position (dotted triangles). Should the chlorine of the first compound react with any of these other competing hydrogens, the unit recited in the counts *does not result*. Instead, unwanted [ortho or meta] isomeric units are formed.

Vogel further argues that the portions of Brit. 41976 relied upon by the board do not preclude the occurrence of branched or crosslinked polymers.

This court recently held that a foreign application relied upon for priority purposes must satisfy the requirements of the first paragraph of 35 U.S.C. § 112. See Kawai v. Metlesics, 480 F.2d 880 (CCPA 1973). We view the attack on Brit. 41976 by Vogel as raising two separate issues regarding the adequacy of its disclosure within the meaning of that paragraph of § 112. These are (1) whether there is an adequate description of the invention, i. e., the polymer, and (2) whether there is an adequate description of how to make that polymer. See In re Ahlbrecht, 435 F.2d 908, 58 CCPA 848 (1971).

We have no doubt that Brit. 41976 contains an adequate description of the polymer called for by the count. As the board pointed out, that application describes the basic polymer unit of the count, the necessary monomers and their reaction by way of examples, to form a polymer. There is no suggestion in Brit. 41976, and this was noted by the board, that branching, crosslinking, or incorporation of recurring units into the polymer but that shown would occur.

We think it clear from those portions of Brit. 41976 relied upon by the Board that one skilled in the art would reasonably conclude that a polymer "composed of" the recurring units shown in the count was obtained by Jones. Such a polymer would, of necessity, be substantially linear. Therefore, the language of Brit. 41976 must be regarded as the legal equivalent of that of the count, though not ipsissimis verbis, since it is the "necessary and only reasonable construction" to be given it. See Wagoner v. Barger, 463 F.2d 1377, 59 CCPA 1213 (1972).

Vogel's assertion that the process described in Brit. 41976 as leading to the polymer of the count of interference 95,-807 will, in fact, result in a polymer of a different structure must be regarded as an attack on the adequacy of that application to describe how to make the invention. Clearly enough, Brit. 41976 does not actually set forth criteria by which it can be determined from that application itself that a polymer within the count was actually obtained. However, from its opinion we think it clear that the board felt that the process de-

scribed by Jones in Brit. 41976, if followed, would inherently produce such a polymer. We agree with that conclusion.

The conditions for polymerization described in Brit. 41976 essentially duplicate those in Vogel's own application but for one important particular. Reactions described by Jones in Brit. 41976 employed temperatures above 250° C., whereas Vogel's application recommends that temperatures not exceeding 250° C. be used. However, experimental work described by Jones, partly in Brit. 10592 and partly in a publication co-authored by him appearing in Journal of Polymer Science, Part C, No. 16 (1967) at page 715, demonstrates that at a temperature above 250° C. branching and crosslinking reactions can occur during polymerization to an extent which increases as the temperature is increased.

Vogel relies on these descriptions as proof that a polymer conforming to that of the count would not be obtained if Jones' procedure were followed. The board disagreed because Jones' procedure included a treatment of the polymer product obtained with a solvent which, in the board's view, would dissolve that portion which was substantially linear. The soluble portion is ultimately recovered from the solvent and it is this material which the board felt was within the scope of the count. The board supported its conclusion by pointing to Vogel's own application wherein the point is made that solubility of the polymer is evidence that it is substantially linear and noncrosslinked.

Vogel strenuously objects to this use of his application to prove that Brit. 41976 would inherently support the count. One ground of objection is the propriety of doing so. On this objection, it is apt to point out that the party seeking to rely upon an earlier application for priority purposes has the burden of showing that the application supports the count in issue. See Wagoner v. Barger, supra, and cases cited therein. However, this does not mean that the party having that burden must affirmatively produce all the evidence necessary to carry it.

Assuming its relevancy, evidence introduced by one party is available to the other for the purpose of supporting elements of its case. Therefore, we see no impropriety in the board's relying upon portions of Vogel's application tending to show that Brit. 41976 inherently supports the count of interference 95,807.

Vogel also objects to reliance upon his application on the ground that it is not relevant. His position seems to be that, because his polymer-producing reactions are carried out below 250° C., the resulting polymer is so different from the polymer obtained by Jones, his solubility test is not applicable to show inherency in Brit. 41976. We find no merit to this.

Assuming for the moment that Jones does obtain the *para* oriented polymer of the count contaminated by the products of branching and crosslinking, it is difficult to see the logic of Vogel's position. If solubility is the criterion by which he can conclude his polymer is substantially linear, the soluble portion of a polymer product containing some nonlinear polymer must also be substantially linear.

Vogel also contends that the board erred in relying upon the solubility test shown in his application for the reason that, in his view, the same test was not accepted by the board as proof of an actual reduction to practice by him. On this point we agree with appellee who points out that the board's real objection was not the relevance of the test but the absence of corroboration.

In reaching our decision, we have not ignored that Vogel asserts that the procedure of Brit. 41976 does not preclude the formation of a linear polymer made up of units having either *meta* or *ortho* substitution. Such a polymer, though linear, would not be within the count. However, such polymer units are not mentioned by Vogel or Jones in their respective applications and from the record as a whole it would appear that their occurrence was not considered by either to be a serious possibility.

We do note that, although Brit. 41976 does suggest that substituents on the aromatic ring undergoing reaction do affect which hydrogen atom is substituted, and this is more than Vogel's application does, from its context it would appear that an ether linkage such as is present in diphenyl ether would direct substitution at the *para* position.

So far we have addressed ourselves to the question of support in Brit. 41976 insofar as it relates to the narrower count of interference 95,807. Most of that discussion is also pertinent to the broader count of interference 95,808, and we conclude that Brit. 41976 possesses adequate support for it.

The specification of Brit. 41976 describes these polymers as thermoplastic materials. It also indicates that *para*, *para'*-diphenyl ether disulfonyl chloride can be reacted with one other monomer and such reactions are described in pertinent examples. The same solubility test applicable to the specific polymer of interference 95,807 appears to be adequate to show that polymers within the scope of this broader count would be obtained if the procedure of Brit. 41976 is followed. In view of these facts, we find that there is adequate support for a count calling for "Thermoplastic, substantially linear polymers consisting essentially of" the recited units.

*Vogel Has Not Established Conception of His Invention Prior to November 6, 1962.*

On this appeal, Vogel relies upon his Exhibit 9, introduced into evidence below, as establishing conception of the subject matter of the counts prior to November 6, 1962. That document entitled "Second Quarter Report, 1962," bears the date it was received by the Central Records Unit of the Central Research Department of Vogel's assignee, Minnesota Mining and Manufacturing Co., Inc. That date was September 13, 1962.

In his briefs before the board in these two interferences, Vogel listed Exhibit 9 with Exhibits 1, 8, and 10, testimony of Vogel and two others, and the *entire* record as evidence of conception. In those briefs Exhibit 9 is not otherwise mentioned. Heaviest reliance was placed upon Exhibit 1 and corroborating testimony to establish conception.

The board's opinions discussed Exhibit 1 and the corroborating testimony but did not refer to ·Exhibit 9. Vogel did not petition the board to reconsider its decisions in view of Exhibit 9 and in 92 reasons for appeal in interference 95,-807 and 85 reasons for appeal in interference 95,808, Exhibit 9 is not specifically mentioned.

In view of these factors, we believe that the present attempt to have us reverse the board and hold that Exhibit 9 establishes conception by Vogel raises a new issue. Not having the benefit of the board's views on this issue, we will not consider it now. Cf. In re Conrad, 439 F.2d 201, 58 CCPA 1013 (1971).

Because of our decision regarding Vogel's evidence of conception, we need not consider whether diligence was exercised from the date of the alleged conception to the filing of his application.

For the foregoing reasons, the decision of the board is affirmed.

Affirmed.